# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2024 DEC 16 AM 11: 31

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

Civil Action No. _____
(To be supplied by the court)

Daniel J. Hines_____, Plaintiff

v.

**Jury Trial requested:**
**(please check one)**
_X_ Yes ___ No

City and County of Denver_____,

Denver County District Attorney's Office_____,

Elizabeth McCann in all Capacities_____,

_____, Defendant(s).

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

# COMPLAINT

| NOTICE |
|---|
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. **Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.** |

**A.    PLAINTIFF INFORMATION**

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

Daniel J. Hines, 24174 Sumac Drive, Golden, CO 80401
  (Name and complete mailing address)

724-504-7713    danhinesdcfiling@gmail.com
  (Telephone number and e-mail address)

**B.    DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1:  **City and County of Denver**
            370 Seventeenth Street, Suite 5300, Denver, CO 80201
            (Name and complete mailing address)

            720-913-9000
            (Telephone number and e-mail address if known)


Defendant 2:  **Denver District Attorney's Office**
            370 Seventeenth Street, Suite5300, Denver, CO 80201
            (Name and complete mailing address)

            720-913-9000
            (Telephone number and e-mail address if known)


Defendant 3:  **Elizabeth McCann**
            370 Seventeenth Street, Suite 5300, Denver, CO 80201
            (Name and complete mailing address)

            720-913-9192
            (Telephone number and e-mail address if known)


Defendant 4:
            (Name and complete mailing address)

            (Telephone number and e-mail address if known)

2

## C.     JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

____     Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

_____

_____

____     Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of _Colorado_____.

If Defendant 1 is an individual, Defendant 1 is a citizen of _____.

If Defendant 1 is a corporation,

Defendant 1 is incorporated under the laws of _____ (name of state or foreign nation).

Defendant 1 has its principal place of business in **Colorado**_____ (name of state or foreign nation).

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

**D. STATEMENT OF CLAIM(S)**

*State clearly and concisely every claim that you are asserting in this action. For each claim,
specify the right that allegedly has been violated and state all facts that support your claim,
including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s)
involved in each claim, and the specific facts that show how each person was involved in each
claim. You do not need to cite specific legal cases to support your claim(s). If additional space is
needed to describe any claim or to assert additional claims, use extra paper to continue that claim
or to assert the additional claim(s). Please indicate that additional paper is attached and label
the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

**CLAIM ONE:** This orientation of this claim began in **2021** when the Defendants failed to
properly investigate a false sexual harassment allegation against the plaintiff, failed to explore
exculpatory evidence, and thus failed to protect the plaintiff. Instead, an adverse employment
action was imposed on the plaintiff, and he was subsequently vilified within the office. The
failures of the defendants had a tremendous personal and professional impact on the PLAINTIFF.
Simultaneously, it also imposed a hostile working environment for the PLAINTIFF. In **2022,** a
second sexual harassment incident was alleged against the plaintiff by the same individual.
Despite overwhelming physical and forensic digital evidence, the defendants continued to
victimize the plaintiff. On May 18, 2023, the plaintiff filed a formal complaint with the Equal
Employment Opportunity Counsel (EEOC). On September 25, 2024, the EEOC issued the
PLAINTIFF A Notice of Right To Sue (NRTS).

Supporting facts:

**I. JURISDICTION**

The United States District Court has jurisdiction over the subject matter of this Charge and
the named Defendants, the City and County of Denver, the Denver District Attorney's Office,
and Elizabeth McCann in all capacities, pursuant to the provisions of the Colorado Revised
Statutes [C.R.S. 1973, 24-34-301 *et seq.*] as reenacted and Title VII of the Civil Rights Act
of 1964 [42 U.S.C. 2000e *et seq.*, as amended.

In May 2023, the Plaintiff filed a formal complaint with the Equal Employment Opportunity
Commission (EEOC). On September 25, 2024, the EEOC issued the PLAINTIFF with a
Notice of Right To Sue (NRTS).

**II. PERSONAL HARM**

**In October and November 2022, the Charging Party ["PLAINTIFF"] first learned of
the Denver District Attorney's calculated conduct affecting her repeated, discriminatory**

animus, dating back to the first allegation in 2021. The PLAINTIFF was subjected to unequal terms and conditions of employment including the employer refusing to utilize its usual and customary procedures, policies, rules, and laws to both investigate and prosecute criminal misconduct visited by the Employer on the PLAINTIFF.    The Employer's discriminatory animus was verified by subordinate management.

## III. DEFENDANTS' POSITION: Denial

## IV. DISCRIMINATION

1. The "PLAINTIFF's title/position is Senior Criminal Investigator for the Denver District Attorney's Office.

2. The PLAINTIFF's W-2 Employer is the City and County of Denver, Denver District Attorney's Office.

3. The name Elizabeth McCann "Beth McCann", the Denver District Attorney, comprehends agents and delegates acting at her direction.

4. The PLAINTIFF has been discriminated against and retaliated against based on his sex, national origin, age, and race.

5. The PLAINTIFF is the victim of direct and indirect discrimination including harassment and intentional victimization by the Denver District Attorney and the Denver City Attorney's refusal to take action in its capacity as the chief legal decisionmaker for the PLAINTIFF's Employer.

6. The conduct of the Denver District Attorney has been lawless in several respects.

7. The PLAINTIFF learned of material wrongdoing in October and November 2022.

8. Before that time, there was an ongoing investigation. The PLAINTIFF's claim of mistreatment was not ripe.

9. Intelligence concerning the Denver District's Attorney's misconduct first came to light in October and November 2022.

## FIRST ALLEGATION AND INVESTIGATION

10. The PLAINTIFF provides the following for a prima facia case of discrimination under Title VII:
    - He is a member of a protected class.
    - He was qualified for the position he held and was performing satisfactorily.
    - He suffered an adverse employment action.

- The adverse action occurred in circumstances giving rise to an inference of discrimination.

11. **The PLAINTIFF is a member of a protected class.** At the time of the first allegation in August 2021, the PLAINTIFF was 50 years old. He is currently 53 years old. The PALINTIFF is male. The PLAINTIFF is Caucasian. The PLAINTIFF has been married for 29 years and has two adult children. The PLAINTIFF does have a verified physical disability listed with the Veterans Administration; however, is not claiming bias based on said disability. Although the employment position is not a "*protected class*" the PLAINTIFF is a retired Pennsylvania State Trooper and is employed by the City and County of Denver, specifically as a Senior Criminal Investigator at the Denver District Attorney's Office. It is well known and discussed among Denver District Attorney office personnel that attorneys are more favorably treated than other staff members, like investigators, secretaries, and victim advocates. In an audio-recorded statement(s) from Beth McCann she believes people based on their position, in this case, (Y.C) was an attorney. The PLAINTIFF is also prepared to provide witness testimony of this fact.

12. At the time of the first and second sexual harassment allegations, (Y.C) was believed to be in her late 20s. (Y.C) is an adult female. (Y.C) is Asian. (Y.C) held the position of Deputy District Attorney.

13. **The PLAINTIFF was qualified for the position he held and performed his job with high accolades and reviews.** From 1990-1999, the PLAINTIFF served in the United States military. This service included achieving a Top Secret/SCI clearance with *Yankee White* endorsement (White House clearance). For most of his military service, the PLAINTIFF served in the Military Police Corps. The PLAINTIFF was also selected to serve with the "*The Old Guard*", which is known as "*The Army's Official Ceremonial Unit and Escort to the President*". During his assignment to *The Old Guard*, the PLAINTIFF was assigned Honor Guard duties at Arlington National Cemetery and throughout the Military District of Washington. The PLAINTIFF had an impeccable military career.

14. From 1999-2019 - The PLAINTIFF honorably served with the Pennsylvania State Police. In 2019, he retired from the Pennsylvania State Police, achieving the rank of Captain. During his career with the State Police, the PLAINTIFF served as a Trooper – Patrol Unit, Trooper - Criminal Investigation Unit, Corporal - Patrol Unit Supervisor, Sergeant - Bureau of Integrity and Professional Standards, Lieutenant – Staff Section Commander, Lieutenant – Station Commander, Lieutenant – Patrol Section Commander, and Captain – Troop Commander. As a Troop Commander, the PLAINTIFF was the Commanding Officer of approximately 280 personnel who were stationed at six State Police Facilities and spanned four counties. The

PLAINTIFF has investigated numerous serious cases, including Homicide, Suicide, Officer-Involved Shootings, Aggravated Assaults, Homicide by Vehicle. Your Affiant has been the Commanding Officer of the following units, the Major Case Team, Patrol Sections, Criminal Sexual harassment investigations Section, Staff Section, Forensic Services Unit, Collision Analysis and Reconstruction, Vehicle Fraud Investigators, Intelligence Unit, Vice/Narcotics Unit, Firearms, Special Projects, Polygraph Unit, Fire Marshal Unit, Evidence (property rooms), K-9 teams, and Drug Recognition Experts (DRE). Aside from the completion of the Pennsylvania State Police Academy, the PLAINTIFF successfully completed over 800 hours of in-service and advanced training courses, including the FBI National Academy (FBINA 265) in 2016. The PLAINTIFF had an impeccable career with the Pennsylvania State Police.

15. In 2019 - the PLAINTIFF successfully completed the Colorado Police Officer's Standards and Training (POST) Academy, at his expense, and has held full Colorado POST certification since his graduation.

16. The PLAINTIFF completed the entire application process for the position of Senior Criminal Investigator with the Denver District Attorney's office and was hired in August 2019.

17. Chief Criminal Investigator Tim Garner provided the following statement in the PLAINTIFF's 2021 Evaluation Report, "*Investigator Hines starts with a basket of lemons and makes lemonade on a weekly, if not daily basis. His determination, grit, thoughtfulness, compassion, respectfulness, drive and humility are unmatched in the investigator corp. The City of Denver Stars rating category for Exceptional is modeled after Dan Hines.*"

18. In August 2019, the PLAINTIFF was hired by Denver District Attorney Elizabeth McCann as a Senior Criminal Investigator, following a 20-year career with the Pennsylvania State Police.

19. Tim Garner, the Chief Criminal Investigator, was the PLAINTIFF's supervisor within the Investigator ranks. Garner is a "Public servant", which, by definition, means "*any officer or employee of government, whether elected or appointed, and any person participating as an advisor, consultant, process server, or otherwise in performing a governmental function, but the term does not include witnesses*".

20. (Y.C) was a Deputy District Attorney at the Denver District Attorney's Office. (Y.C.) was hired by Denver District Attorney Elizabeth McCann. (Y.C) is an Asian female, approximately late 20s to early 30s.

21. The PLAINTIFF requested a voluntary transfer from County Courtrooms 3A and 3B (office 9.B.6) to District Courtroom 4H (office 8.C.6).

22. On or about July 20, 2021, this transfer was approved by the Denver District Attorney and the PLAINTIFF officially moved his office from County Courtrooms 3A and 3B (office 9.B.6) to District Courtroom 4H (office 8.C.6). Chief Deputy District Attorney Effie Antonopoulos was the PLAINTIFF's supervisor in Courtroom 4H.

23. **The PLAINTIFF suffered an adverse employment action and an adverse action occurred in circumstances giving rise to an inference of discrimination.** On/about August 20, 2021, Garner entered the PLAINTIFF's office unannounced. Garner sat down in one of the PLAINTIFF's chairs and asked the PLAINTIFF if he was aware of the allegation (Y.C) made against Deputy District Attorney Kate Tierney a few weeks earlier. The PLAINTIFF said he was and added that he was upset and vocal about it.

24. Garner asked the PLAINTIFF if he had heard that (Y.C) made a recent sexual harassment allegation against another person. The PLAINTIFF responded, "*Yes. I think it was either Teresa (Aguilar) or Kate (Tierney) who told me.*" The PLAINTIFF explained to Garner that whoever mentioned it to me, he immediately said to that person, "*I don't want to know. The less I know the better (covering his ears).*"

25. Garner then just stared at the PLAINTIFF. The PLAINTIFF asked, "*It wasn't me, was it?*" Garner nodded his head. The PLAINTIFF immediately said, "*You have got to be kidding me!!*" The PLAINTIFF expressed his anger and frustration. Garner stated (Y.C) had alleged coming to his office to discuss a "child porn case". The PLAINTIFF immediately said that was a lie because he has never investigated or assisted in a child porn case in this office. Garner explained the alleged incident occurred sometime between June - July 2021.

26. Garner did not provide Garrity warnings (*Garrity v. New Jersey*) to the PLAINTIFF at the onset of his questioning. The Plaintiff assumed this investigation was criminal since he was not provided Garrity Advisement.

27. Garner stated (Y.C) alleged the PLAINTIFF told her he was attracted to Asian women. Garner stated (Y.C) alleged the PLAINTIFF told her, "*If I was single....*". The PLAINTIFF adamantly denied the allegation. The PLAINTIFF immediately pointed to his desk phone and told Garner to call his wife. Garner asked why. The PLAINTIFF asked him to call his wife to ask her if he had ever expressed that Asian females were attractive to him. Garner stated he didn't need to call the PLAINTIFFs wife.

8

28.  Garner asked the PLAINTIFF if he ever sent (Y.C) any texts or emails.  Garner stated (Y.C) alleged the PLAINTIFF sent "*numerous texts and emails*" to her.  The PLAINTIFF adamantly denied any harassing emails and/or texts.

29.  The PLAINTIFF tossed his cell phone across his desk to Garner and said, "*Dump my phone.  Please dump my phone.*"  Garner stated he didn't need to dump my phone.  At that point, the PLAINTIFF stated, "*Then I have no way to prove I didn't do this. You're not giving me a way to prove my innocence.*"

30.  Moments later, Assistant District Attorney Zach McCabe entered the PLAINTIFF's office and asked if the PLAINTIFF had the opportunity to speak with Garner.  The PLAINTIFF stated he had.  McCabe asked the PLAINTIFF if there was anything the PLAINTIFF needed to tell them (insinuating the PLAINTIFF had done something inappropriate).  The PLAINTIFF immediately stated it was "*bullshit*" and expressed his anger over it.  McCabe then proceeded to ask the PLAINTIFF if he sent sexually harassing texts to (Y.C).  The plaintiff adamantly denied all allegations.

31.  McCabe did not provide Garrity warnings (*Garrity v. New Jersey*) to the PLAINTIFF at the onset of his questioning.

32.  The PLAINTIFF remained adamant he didn't and again tossed his cell phone on the desk and **repeatedly begged** Chief Investigator Garner and Assistant District Attorney Zach McCabe to conduct a forensic download of his phone.

33.  The PLAINTIFF asked if they had physically seen (Y.C)'s phone.  They explained they hadn't.  The PLAINTIFF then explained a piece of paper (screenshot) is meaningless.  The PLAINTIFF reminded them that anyone could fabricate a contact, using their own phone number, text themselves, and it would falsely appear as if that person texted them.  The plaintiff's suspicious were immediately dismissed.

34.  McCabe asked the PLAINTIFF if he had a verbal conversation with (Y.C).  The PLAINTIFF explained he had recalled having a conversation with (Y.C) about a Korean restaurant the PLAINTIFF and his wife used to go to in the Denver area.  The PLAINTIFF explained the restaurant used to serve their favorite dish, spicy squid, but recently had removed it from the menu.  The PLAINTIFF explained he and his wife have been driving to Colorado Springs every couple of months to go to some of the Korean restaurants in that area.

35.  McCabe asked the PLAINTIFF, "*Well why would she say this?*"  The PLAINTIFF got very angry and asked, "*I don't know!  Go ask her!*"  McCabe insinuated the PLAINTIFF's guilt and asked the PLAINTIFF, "***Don't you think it took a lot of***

*courage for her to come forward?"* The PLAINTIFF emotionally responded,
*"Courage of what? To tell a lie!?"*

36.  McCabe asked the PLAINTIFF, *"Did you ever tell her she reminded you of your
daughter?"* The PLAINTIFF exclaimed, *"My daughter?!"* The PLAINTIFF stood
up (crying), grabbed a picture of his family, and set it down on his desk in front of
McCabe and Garner. The PLAINTIFF pointed at the photo and explained his
daughter was a humble, selfless, and kind person and then said, *"That's not Yujin
(Y.C)."*

37.  The PLAINTIFF then asked, *"Do you know whom my daughter reminds me of…?
Kate Tierney!"* Garner immediately said, *"I remember you telling me that."* The
PLAINTIFF responded, *"Yeah, because that's the truth!"* The conversation ended
and McCabe and Garner left the PLAINTIFF's office.

38.  On/about August 22, 2021, the PLAINTIFF had a conversation with Garner in his
office. The PLAINTIFF was told he was being involuntarily transferred from
Courtroom 4H (room 8.C.6) to Courtroom 5F (room 8.G.8) because of this
investigation.

39.  Garner showed the PLAINTIFF a piece of paper that depicted a screenshot of **the
only text** (Y.C) provided to Garner. The single paper screenshot depicted an alleged
text from Hines to (Y.C) which said, *"Hey do you have time tomorrow morning to
chat?"* Again, the PLAINTIFF expressed his innocence, but also **adamantly claimed
he never sent that text**. The PLAINTIFF also expressed the benign nature of the
text itself. Garner agreed to the benign nature. The PLAINTIFF expressed the impact
these allegations have had on him.

40.  On August 25, 2021, the PLAINTIFF printed out a report on a nearby copier. The
PLAINTIFF exited his office and turned to walk toward the copier room. At the same
time the Chief of Staff, Liza Willis, was walking towards the PLAINTIFF from the
other direction. As they passed, Willis said hello to the PLAINTIFF. The
PLAINTIFF didn't look up from his stare at the floor. The PLAINTIFF entered the
copier room and retrieved his paperwork. As the PLAINTIFF exited the copier room
to head back to his office, he noticed Willis standing next to his office door and
staring at him. As the PLAINTIFF approached his office, Willis asked if she could
talk to him. The PLAINTIFF agreed and Willis suggested they walk into his office.
Willis began the conversation and said, *"Please don't hang your head like that"* and
added that it bothers her to see the PLAINTIFF walking around like that. The
PLAINTIFF asked her, *"What do you expect me to do?"* and again broke down into
tears. During the conversation, the PLAINTIFF continued to profess his innocence.
Willis suggested, *"Please, go talk to Beth (McCann)"*. The PLAINTIFF asked what

he needed to talk to McCann about. Willis explained McCann may be able to explain things to the PLAINTIFF. The PLAINTIFF explained he didn't need to talk to McCann because the decision (to involuntarily transfer the PLAINTIFF) was already made, and he was now vilified and made to feel embarrassed and ashamed. The PLAINTIFF asked what office he was supposed to move to. Willis walked the PLAINTIFF over to the eastern side of the building to the office for Courtroom 5F (Room 8.F.11).

41.    On August 25, 2021, the PLAINTIFF moved his office, in compliance with Denver District Attorney Elizabeth McCann's mandated involuntary transfer. This move created a perception of wrongdoing as he wheeled his office and personal belongings in a "walk of shame" during normal business hours. Immediately, several people began to ask the defendant what happened since he had just moved to the previous courtroom a few weeks earlier. This permanent adverse employment action involuntarily forced the PLAINTIFF to reassignment to a different office, different courtroom assignments, different investigations, different supervisors, and different Denver District Attorney Office personnel.

42.    This adverse employment action toward the PLAINTIFF created the immediate impression within the Denver District Attorney's Office that the PLAINTIFF was guilty and simultaneously created a hostile work environment that spanned from the first sexual harassment investigation (September 2021) through the second sexual harassment investigation (November 2022). The impression of guilt and the creation of a hostile work environment is well documented in the PLAINTIFF's Charge and the numerous acquired written statements. These written statements are from Denver District Attorney employees who witnessed and heard the discussions and assumptions of guilt toward the PLAINTIFF. The PLAINTIFF is prepared to provide testimony from numerous present and past employees who witnessed the hostile environment imposed on the PLAINTIFF and created by Denver District Attorney Elizabeth McCann and her immediate staff. McCann's immediate staff have themselves told the PLAINTIFF of their witness accounts during **audio-recorded meetings** and expressed their observations of the negative impact the adverse employment action and subsequent hostile work environment had on the PLAINTIFF.

43.    In a September 7, 2021, **audio-recorded meeting** (22:01 minutes), the PLAINTIFF repeatedly professed his innocence with Denver District Attorney's Office Chief of Staff Liza Willis and Chief Criminal Investigator Tim Garner. The PLAINTIFF repeatedly stated the sexual harassment allegations against him were fabricated. The PLAINTIFF repeatedly stated he never sent text messages to (Y.C). The PLAINTIFF repeatedly suggested (Y.C) fabricated a phone contact with his name and texted herself to purport the PLAINTIFF was sexually harassing her. The PLAINTIFF

11

repeatedly reminded Chief of Staff Willis and Chief Investigator Garner he repeatedly asked (even begged) for a forensic analysis on his phone to prove his innocence. After the PLAINTIFF repeatedly advised a person can fabricate a phone contact and text themselves, Chief of Staff Liza Willis told Chief Criminal Investigator Tim Garner, "*Remind me, I want to look further into that*". Chief of Staff Willis told the PLAINTIFF that Denver District Attorney Elizabeth McCann assumed (Y.C)'s innocence and stated, "*There was a reason for believing her [(Y.C)]*". This comment simultaneously insinuated the PLAINTIFF was not believable and guilty of the allegation, albeit there was no evidence. The PLAINTIFF was advised to avoid all contact with (Y.C) and change how he conducts himself. The PLAINTIFF was told the involuntary transfer/reassignment was done "*to make her [(Y.C)] feel comfortable*". The PLAINTIFF was originally told the involuntary transfer/reassignment was done to protect him. The PLAINTIFF explained any distance would not stop a fictitious allegation. (Ironically, this statement became reality in October 2022, because Denver District Attorney Elizabeth McCann favorably treated (Y.C) and **failed to protect the PLAINTIFF** and investigate available exculpatory evidence that would have caused (Y.C)'s termination in September 2021). Chief of Staff Liza Willis told the PLAINTIFF he had **no choice in the involuntary transfer/reassignment**. The PLAINTIFF stated he believed the involuntary transfer was "*punishment*". The PLAINTIFF inquired why nothing was done to (Y.C). The PLAINTIFF stated he was aware (Y.C) had made previous allegations against other people within our office and outside the office, including a sitting Denver County Judge, A.E., and Defense Attorney C.R.B. Chief of Staff Liza Willis told the PLAINTIFF he was moved "*to make her [(Y.C)] feel comfortable*". The PLAINTIFF stated he was already facing the perception of guilt from coworkers. This perception of guilt was created by the adverse employment action by the Denver District Attorney Elizabeth McCann. The PLAINTIFF repeatedly stated he viewed it as punishment. The PLAINTIFF stated, "*The thing about it is, for the rest of my life, I will have a tarnished career. I will have an allegation against me that I can't disprove. I wanted nothing more than to disprove. To be able to dump my phone. To be able to dump the emails.*" The PLAINTIFF asked for a copy of the investigative report, but his request was denied by Chief of Staff Liza Willis because she stated "*because nothing was being done*". The PLAINTIFF disagreed and pointed out the adverse employment action of the involuntary move. Chief of Staff Liza Willis then stated to Chief Investigator Tim Garner, "*And I'd like to see that, and I think you sent it to me. The text. Let's look further into that, can we?*" The PLAINTIFF believed the Denver District Attorney's Office was going to look further into the alleged text(s). The PLAINTIFF advised he was planning on talking to an attorney because he felt he was wronged. At closing, Chief of Staff Liza Willis stated, "*I wish it had not come down to this. I am sorry. I don't know why you are getting targeted or why you were.*" **Again, this entire meeting was audio recorded.**

44. Based upon the aforementioned audio-recorded conversation from September 7, 2021, the PLAINTIFF was under the impression the Denver District Attorney's Office and Denver District Attorney Elizabeth McCann and her staff were going to further investigate the PLAINTIFF's assertions that (Y.C) had fabricated a phone contact, texted herself, and alleged it was sent by the PLAINTIFF. Unbeknownst to the PLAINTIFF in the months to follow, this was never done.

45. In September 2021, the first sexual harassment investigation was initially ruled, "NOT-SUSTAINED", which means, "*Insufficient evidence to either prove or disprove that a violation occurred*". This disposition effectively destroyed any professional opportunities the PLAINTIFF could have pursued. Exculpatory evidence was available, but the Denver District Attorney's Office intentionally or negligently failed to pursue it, thus irrevocably damaging the PLAINTIFF's career and future opportunities.

46. Denver District Attorney Elizabeth McCann repeatedly referred to (Y.C) as a "*victim*" without obtaining any impeachment or defensive evidence from the PLAINTIFF.

47. Denver District Attorney Elizabeth McCann instituted no privacy protections to protect the PLAINTIFF, thereby allowing many individuals in the office who did not have a need to know to learn of the alleged wrongdoing. The preceding invasion of privacy adversely impacted and still does. It is a continuing violation.

48. Denver District Attorney Elizabeth McCann's conduct and failures since September 2021 imposed professional harm on the PLAINTIFF because she failed or refused to fully investigate the first sexual harassment allegation, which would have conclusively proven the PLAINTIFF's innocence through available exculpatory evidence. This type of available digital evidence is routinely extracted, investigated, and used as part of investigations handled by the Denver District Attorney's Office, by trained employees and available equipment to promptly extract this type of digital evidence.

49. The PLAINTIFF has acquired numerous written statements about the adverse employment action, imposed by the Denver District Attorney Elizabeth McCann, which deleteriously impacted the PLAINTIFF's professional and personal life and created a hostile work environment for the PLAINTIFF at the Denver District Attorney's Office. Aside from written statements, the PLAINTIFF is prepared to provide numerous other current and former employees who also have provided verbal statements about the adverse employment action and hostile work environment and have expressed their willingness to provide testimony. Some of these witnesses are within the immediate staff of Denver District Attorney Elizabeth McCann.

50. As a result of Denver District Attorney Elizabeth McCann's instruction to stay away from (Y.C) and the subsequent public shaming within the office, the PLAINTIFF declined to attend numerous professional conferences from 2021 - 2023. Leading up to these professional conferences, the PLAINTIFF explained his reasoning to other employees when they asked him if he planned to attend these professional training sessions.

51. From September 2021 through November 2022, the PLAINTIFF received several documented unsolicited job opportunities. During this time, the final outcome of the first investigation "NOT-SUSTAINED" irrevocably damaged the PLAINTIFF's marketability, based on the type of the allegation (recent sexual harassment), the incompetent and incomplete September 2021 investigation, and the failure to pursue exculpatory evidence which would have cleared the PLAINTIFF of all wrongdoing. During any potential employment application process within the law enforcement/criminal justice community, the PLAINTIFF would have been required to disclose the investigation and outcome (NOT SUSTAINED), and had no way to disprove the sexual harassment allegations at that time.

52. The PLAINTIFF had several meetings with members of the Denver District Attorney's Office Peer Support Team. During these meetings, the PLAINTIFF emotionally professed his innocence, his intense depression, the failure to pursue exculpatory evidence, and the emotional impact of the false sexual harassment allegations and subsequent failures of the City and County of Denver, the Denver District Attorney's Office, and Denver District Attorney Elizabeth McCann have had on his life, professionally and personally.

53. The PLAINTIFF continually lived in fear and a state of anxiety. Since he was not believed during the first allegation/investigation, he was always concerned with another false allegation and the office's failure to investigate it. How he would interact with office personnel, especially females, was irrevocably changed.

54. The PLAINTIFF spoke with his medical doctor and was prescribed an anti-anxiety/anti-depressant, something that the PLAINTIFF had never prescribed previously.

55. Chief Criminal Investigator Tim Garner acknowledged the vilification office personnel have had on the PLAINTIFF and specifically advised Deputy District Bilal Aziz had called the PLAINTIFF "*a monster.*"

56. The PLAINTIFF spoke with Chief Criminal Investigator Tim Garner and expressed the impact of the vilification within the office. The PLAINTIFF asked to be moved

to the Economic Crimes Unit (ECU). Even though the PLAINTIFF never worked on
Economic Crimes, he actively sought this move to provide a more secure and isolated
location for him to work away from the rest of the office personnel.

57.   The impact of the vilification and imposition of instructions by the Denver District
Attorney's Office (to avoid contact with (Y.C)) made it impossible for the
PLAINTIFF to attend social gatherings, such as retirement events. In February 2022,
the PLAINTIFF had just arrived with Chief Criminal Investigator Tim Garner at the
retirement gathering for Chief Deputy District Attorney Adrienne Greene. When
(Y.C) arrived moments later, the PLAINTIFF told Garner he was immediately
leaving the event because he needed to protect himself. Garner advised he understood
and walked back to the office with the PLAINTIFF.

58.   The continued preferential treatment of (Y.C) by Denver District Attorney Elizabeth
McCann is documented in numerous written statements. According to former Denver
Deputy District Attorney (now Arapahoe County Deputy District Attorney) Kate
Tierney's written statement, in part, "*Ms. (Y.C), on the other hand, had not suffered
any professional consequences, and the office had not taken any action to combat
issues with her in the future. **Although I was no longer friends with her due to her
unfounded accusations against me**, I could see through social media and through
people I was still friends with at the Denver DA's Office that she thrived. She was
promoted to the Family Violence Unit, a unit within the office that relies heavily on
integrity and ethical standards for incredibly serious cases involving domestic
violence and child abuse. She maintained all of her connections within the office and
attended our annual prosecutor's conference in 2021 and 2022. Given that other
attorneys were also interested in the Family Violence Unit who were more
experienced and passionate about the work than Ms. (Y.C), and yet she received the
spot when it opened, it is hard to see it as anything other than a promotion because
of these allegations; again, giving Ms. (Y.C) something because she was perceived
as the victim in the situation.*"

59.   Denver District Attorney Elizabeth McCann's conduct and failures continued to
impose professional and personal harm on the PLAINTIFF because she **failed to
protect the PLAINTIFF** from further false allegations from the same accuser. If
Denver District Attorney Elizabeth McCann had fully investigated the first sexual
harassment allegation in September 2021 and investigated available exculpatory
evidence as promised to the PLAINTIFF by Chief of Staff Liza Willis (in the audio-
recorded meeting on September 7, 2021), it would have conclusively proven the
PLAINTIFF's innocence through exculpatory evidence, (Y.C) would have been
terminated and there wouldn't be a second sexual harassment allegation. **If the first
sexual harassment investigation had been <u>fully</u> investigated, (Y.C) would have
been fired in September 2021 and the PLAINTIFF would not have been**

subjected to <u>any</u> of the following events.

60.  In October 2022, at the initiation of the second sexual harassment investigation, Denver District Attorney Elizabeth McCann continued in a course or pattern of conduct that continued to protect (Y.C) and subjected the PLAINTIFF to a hostile work environment which continued past the conclusion of the second sexual harassment investigation.

61.  **On October 14, 2022, (Y.C) initiated false sexual harassment allegations, for the <u>second</u> time against the PLAINTIFF.**  (Y.C) was having dinner with numerous Denver District Attorney employees (Attorneys).  (Y.C) verbally and electronically reported to several Denver District Attorney employees, including Chief Deputy District Attorneys Daniel Cohen and Melissa Fox, that she allegedly received sexual harassment text messages from the PLAINTIFF.  Both are considered "Public Servants" by definition.

62.  Simultaneously, while (Y.C) was fabricating the false sexual harassment allegations against the PLAINTIFF, the PLAINTIFF was at a high school football game and seated next to his wife and the parents of their son's girlfriend while they watched their son play in the varsity football game.

63.  (Y.C) initiated a text conversation with Chief Deputy District Attorney Daniel Cohen and alleged she received "*disgusting*" text messages from the PLAINTIFF.  (Y.C) then sent a screenshot of the alleged text messages to Chief Deputy District Attorney Daniel Cohen.  The timestamp on the screenshot image (Y.C) sent to Chief Deputy District Attorney Daniel Cohen clearly indicated she allegedly received the PLAINTIFF's "*disgusting*" text messages **44 minutes <u>after</u> she began the text conversation with Chief Deputy District Attorney Daniel Cohen about receiving "disgusting" text messages from the PLAINTIFF.**  Despite the visible contradiction with the timestamp on the alleged text messages, Cohen provided blanket believability to (Y.C).  She and Chief Deputy District Attorney Daniel Cohen exchanged text communication that was sympathetic to (Y.C), and discussed their alcohol consumption, while ironically assuming the PLAINTIFF was possibly using illicit drugs and alcohol usage.  For the record, the PLAINTIFF has never even tried a cigarette.  These texts were recovered for evidentiary purposes.  These text communications between (Y.C) and a supervisor (Cohen) within the Denver District Attorney's Office were not only inappropriate between a supervisor and subordinate but were also inflammatory against the PLAINTIFF.

64.  Denver District Attorney Elizabeth McCann intentionally or negligently disregarded physical evidence that would have, at a minimum, prompted further questioning of (Y.C) about her submitted screenshot to Chief Deputy District Attorney Cohen

regarding the allegations against the PLAINTIFF.

65.  Instead, Denver District Attorney Elizabeth McCann and her staff continued to assume (Y.C) was a victim and the PLAINTIFF was guilty. Over the weekend, Chief Deputy District Attorneys Daniel Cohen and Melissa Fox assumed (Y.C) was a victim and periodically checked on (Y.C)'s well-being.

66.  Chief Criminal Investigator Tim Garner interviewed and collected written statements from witnesses that (Y.C) reported the allegations. These statements provided documented evidence employees were fully aware of the first sexual harassment allegations against the PLAINTIFF in September 2021 and substantiated the caustic hostile environment in which the PLAINTIFF was forced to work where he has been routinely vilified.

67.  On October 18, 2022, the PLAINTIFF was confronted in his office. This meeting was **audio-recorded** by Chief Criminal Investigator Tim Garner. Denver District Attorney Elizabeth McCann again violated the PLAINTIFF's rights, as protected under *Garrity v. New Jersey*. The PLAINTIFF was never advised of his rights under *Garrity v. New Jersey*; therefore, the PLAINTIFF believed the investigation was not administrative and was criminal. The PLAINTIFF was confronted in his office by the senior ranking command staff of the Denver District Attorney's Office. The PLAINTIFF feared his job was in jeopardy once again. The PLAINTIFF was shown a single piece of paper with a cell phone screenshot of several texts that (Y.C) alleged were sent by the PLAINTIFF. The PLAINTIFF adamantly denied any communication, demanded to immediately be given a polygraph, and immediately handed over his phone for personal examination by Chief Criminal Investigator Tim Garner. Garner observed numerous images and videos the PLAINTIFF captured of his son playing football on the same date/time as (Y.C)'s allegations. There were no texts to (Y.C).

68.  On October 18, 2022, the PLAINTIFF again asked to prove his innocence when he voluntarily provided his text log records. With Chief Criminal Investigator Tim Garner present and providing personal overwatch, the PLAINTIFF contacted his wife to acquire their Verizon log in credentials. While Garner was watching and directing the PLAINTIFF where to navigate on the side, the PLAINTIFF exported call and data logs. These logs were immediately emailed to Garner. These logs conclusively proved the PLAINTIFF's phone never contacted (Y.C)'s phone and (Y.C)'s allegations against the PLAINTIFF were completely false. Simultaneously, it also provided evidence the PLAINTIFF was victimized by (Y.C). It also proved the Denver District Attorney's Office victimized the PLAINTIFF, by failing to protect the PLAINTIFF after the first sexual harassment allegation in 2021.

69. On October 19, 2022, the PLAINTIFF was again asked to prove his innocence when he was requested to consent to a forensic analysis of his phone. The PLAINTIFF consented and a forensic analysis of his phone. The forensic analysis was conducted by Senior Criminal Investigator Adam Bechthold, a qualified expert on phone extractions and analysis. Once again, the evidence proved the PLAINTIFF's phone never contacted (Y.C)'s phone and (Y.C)'s allegations against the PLAINTIFF were completely false. Simultaneously, it also provided evidence the PLAINTIFF was now a victim of criminal actions against him. The report indicated a contact for (Y.C)'s phone number, XXX-XXX-5269, was created in the PLAINTIFF's phone contacts on February 21, 2020, **over a year and a half before the first allegation**. The forensic report also indicated (Y.C)'s contact was "BLOCKED" in the PLAINTIFF's phone contacts on June 18, 2022, almost **four months before the second allegation**. It conclusively proved the PLAINTIFF's phone never contacted (Y.C)'s phone.

70. In an October 19, 2022, **audio-recorded meeting** (9:18 minutes) with Chief Criminal Investigator Tim Garner, the PLAINTIFF expressed his desire to pursue criminal charges against the person(s) who fabricated the false allegations against the PLAINTIFF. The PLAINTIFF explained the personal and professional impact it has had on his life since the first sexual harassment investigation (September 2021). Chief Criminal Investigator Garner stated, "*And rightfully so. You're guarded.*" The PLAINTIFF stated, "*I am 100% guarded.*" The PLAINTIFF also stated, "*And that's why I've been secluded. I'm like a hermit.*" The PLAINTIFF explained he was told by coworkers of their observations of the negative physical and emotional impact it had on the PLAINTIFF since the first sexual harassment investigation.

71. On October 19, 2022, and again on October 20, 2022, (Y.C) refused to meet with Beth McCann and her staff. At this time, (Y.C) exchanged Microsoft TEAMS messages with Chief Deputy District Attorney Daniel Cohen, Deputy District Attorney Mary Krenzen, and Deputy Brittany Cooper. These messages were forensically recovered by Senior Criminal Investigator Adam Bechthold and indicated her willful intent to not cooperate with the investigation. Additionally, the messages continued to vilify and target the PLAINTIFF:

| FROM | TO | DATE/TIME | MESSAGE |
|------|-----|-----------|---------|
| Krenzen | (Y.C) | 11/01/2022 11:22:43 | *"I'm going to put a white board in ECU where the only thing you can erase is the date and day of the week and the rest of it will say "and yet here you are"*<br><br>**[Economic Crime Unit is where the PLAINTIFF works]** |

72. On October 21, 2022, (Y.C) met with Chief Criminal Investigator Tim Garner and Chief of Staff Liza Willis. (Y.C) possessed her iPhone during this meeting. (Y.C) advised she deleted the alleged text messages from her iPhone but had a backup of the alleged text messages on her Apple MacBook Air, which was at her residence. (Y.C) advised she would bring in both devices on Monday, October 24, 2022. Although Denver District Attorney Beth McCann and her staff already possessed conclusive evidence that proved the PLAINTIFF's innocence, they continued to provide (Y.C) with favorable treatment and failed to take steps to physically secure evidence ((Y.C)'s iPhone) which further victimized the PLAINTIFF.

73. On October 21, 2022, (Y.C) voluntarily provided the Denver District Attorney with alleged *Verizon* phone records (text log), via a Denver District Attorney's office email to Chief Criminal Investigator Tim Garner. This alleged text log was examined by Chief Criminal Investigator Tim Garner who determined (Y.C) fabricated physical evidence. (Y.C) had fraudulently inserted the PLAINTIFF's phone number. This evidence proved (Y.C) was intentionally targeting the PLAINTIFF. Although Denver District Attorney Elizabeth McCann and her staff possessed conclusive evidence that proved the PLAINTIFF's innocence, fabricated physical evidence, and now a distinct *Attempt to Influence* (a felony), they continued to provide (Y.C) with favorable treatment and intentionally ignored this fabricated physical evidence and took no steps to secure physical evidence ((Y.C)'s iPhone) which further victimized the PLAINTIFF.

74. On October 21, 2022, (Y.C) advised the Denver District Attorney's Office, via a conversation with her supervisor, Chief Deputy District Attorney Danielle Robinson, that she intended to "*reset her phone over the weekend*". Although the Denver District Attorney's Office was aware of (Y.C)'s plan to intentionally destroy physical evidence (resetting her phone), they continued to provide (Y.C) with favorable treatment and intentionally ignored this and took no steps to secure physical evidence ((Y.C)'s phone) which further victimized the PLAINTIFF. (Y.C)'s intent to destroy her phone was later documented in a written statement by Robinson.

75. On October 22, 2022, (Y.C) intentionally damaged her phone and MacBook Air and alleged they were accidentally exposed to water. (Y.C) alleged her phone fell in the bathtub and she also alleged she accidentally spilled water on her MacBook Air. Acquired Apple Store work order receipts (3 hours and 25 minutes apart from one another, sequentially 22 work orders apart, and handled by two different Apple employees from the same Apple store) indicated (Y.C) subjected her devices to water. The work orders documented "*Customer does not wish to pursue data rescue for messages*". (Y.C) advised she left both devices at the Apple store. Although Denver District Attorney Elizabeth McCann and her staff were aware (Y.C) carried out her

intent to destroy physical evidence, and the location of her devices, they continued to provide (Y.C) with favorable treatment and intentionally ignored this and took no steps to secure physical evidence ((Y.C)'s phone) which further victimized the PLAINTIFF.

76. On Saturday, October 22, 2022, (Y.C) sent an email to the Denver District Attorney's Office regarding her damaged iPhone and MacBook Air. Although Beth McCann and her staff were aware (Y.C) intentionally damaged her iPhone and MacBook Air, they continued to provide (Y.C) with favorable treatment and intentionally ignored this and took no steps to secure physical evidence ((Y.C)'s phone and MacBook Air) which could have provided additional physical evidence. This further victimized the PLAINTIFF.

77. On Monday, October 24, 2022, (Y.C) returned to work with a completely changed demeanor, as observed by her supervisor, Chief Deputy District Attorney Danielle Robinson. Robinson documented (Y.C)'s dramatic change as (Y.C) appeared **as though she had gotten away with something**.

78. On Monday, October 24, 2022, Assistant District Attorney Zach McCabe and Chief Criminal Investigator Tim Garner met with (Y.C). (Y.C) continued her subterfuge and alleged she was unable to log into her *Verizon* account, in their presence, because it was a family plan. They coordinated to meet with (Y.C) the following morning and provide personal overwatch while she logged into her Verizon account. Instead of pressing (Y.C), they continued to provide (Y.C) with favorable treatment which allowed her to fabricate more physical evidence the following day. This further victimized the PLAINTIFF.

79. On Tuesday, October 25, 2022, Assistant District Attorney Zach McCabe and Chief Criminal Investigator Tim Garner were provided with another set of alleged phone records by (Y.C). These records were examined by Chief Criminal Investigator Tim Garner who determined (Y.C), once again, fabricated physical evidence which included the PLAINTIFF's phone number. **This was the second time (Y.C) fabricated physical evidence on her Denver District Attorney laptop and submitted a set of alleged text logs that were created by (Y.C) and targeted the PLAINTIFF**. Although Denver District Attorney Elizabeth McCann and her staff already possessed conclusive evidence which proved the PLAINTIFF's innocence, along with a previously fabricated phone log from (Y.C), they continued to provide (Y.C) with favorable treatment and the Denver District Attorney's Office intentionally ignored this second fabrication of evidence and took no steps to secure physical evidence ((Y.C)'s phone and MacBook Air at the Apple store) which further victimized the PLAINTIFF.

80.   On Tuesday, October 25, 2022, Chief Criminal Investigator Tim Garner filed search warrants for *Verizon* phone records. Chief Investigator Garner authored the legal document(s). The affidavit stated, in part, "*Your affiant [Garner] thoroughly investigated a prior sexual harassment complaint made by (Y.C) against investigator Dan Hines in August 2021. The outcome of this investigation **resulted in a written reprimand to investigator Hines**.*" Not only does this, once again, connect the first and second sexual harassment allegations/investigation, but this statement **is a completely false, inflammatory, and prejudicial statement against the PLAINTIFF.** To date, the Denver District Attorney's Office has made no effort to correct this document within the courts. When confronted with this false statement in an affidavit of probable cause, the office dismissively provided the PLAINTIFF with a letter that stated this statement was an error and no letter of reprimand was ever issued or exists. This affidavit of probable cause was filed with Denver County Courts, and is still open to public examination; therefore, it continuously victimizes and harms the PLAINTIFF.

81.   In a Tuesday, November 1, 2022, **audio-recorded phone call** (12:09 minutes), Chief Criminal Investigator Tim Garner contacted the PLAINTIFF to advise that he received the *Verizon* phone records. Garner had confirmed the results with the FBI. These records provided conclusive evidence which, once again, proved the PLAINTIFF's innocence. They also conclusively proved (Y.C) targeted the PLAINTIFF and fabricated a contact with the PLAINTIFF's name, used her phone number, and then repeatedly sent text messages to herself purporting them from the PLAINTIFF. **Ironically, this was the exact theory the PLAINTIFF told Chief of Staff Liza Willis and Chief Criminal Investigator Tim Garner in the September 7, 2021 meeting** that they advised the PLAINTIFF, "*And I'd like to that see that, and I think you sent it to me. The text. Let's look further into that, can we?*" This also confirmed the alleged Verizon phone logs, which were submitted by (Y.C) on October 21st and October 25th, were fabricated physical evidence. Instead of <u>immediate</u> termination and subsequent criminal arrest, they continued to provide favorable treatment to (Y.C). Even with this overwhelming physical evidence, (Y.C) still handed criminal cases on November 1, 2024, and had full access to CJIS information for the rest of the day.

82.   On Wednesday, November 2, 2022, (Y.C) was terminated from the Denver District Attorney's Office. The PLAINTIFF respectfully requests the Court to compare the wording in her termination letter which stated, in part, "*The evidence obtained in our investigation clearly shows that you fraudulently created text messages that appeared to be sent to you by DH, in an effort to cause him to be dismissed from employment for sexual harassment.*" to the criminal elements of **Colorado Revised Statutes (C.R.S.) 18-8-306, Attempt to Influence a Public Servant**, "*Any person who attempts to influence any public servant by means of deceit or by threat of violence*

21

*or economic reprisal against any person or property, with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action concerning any matter which is to be considered or performed by him or the agency or body of which he is a member, commits a class 4 felony".* By definition, "Public servant" means any officer or employee of government, whether elected or appointed, and any person participating as an advisor, consultant, process server, or otherwise in performing a governmental function, but the term does not include witnesses. Denver District Attorney Elizabeth McCann continued to provide favorable treatment towards (Y.C) and intentionally refused to file criminal charges despite an overwhelming abundance of evidence and conduct that clearly fit the criminal elements. This further victimized the PLAINTIFF.

83. On Wednesday, November 2, 2022, Chief Criminal Investigator Tim Garner examined (Y.C)'s employment laptop. He discovered physical evidence that proved (Y.C) had used her laptop to fabricate and transfer physical evidence (the alleged *Verizon* logs on October 21st and October 25th) against the PLAINTIFF. This proved (Y.C) violated **Colorado Revised Statutes (C.R.S.) 18-8-111(a)(II), False Reporting to Authorities – False Information**, which states, "*A person commits false reporting to authorities if he/she unlawfully made a report or knowingly caused the transmission of a report to law enforcement authorities of a crime OR other incident within their official concern when the defendant knew that it had not occurred.*" Denver District Attorney Elizabeth McCann continued to provide favorable treatment to (Y.C) and intentionally refused to file criminal charges. This further victimized the PLAINTIFF.

84. On Wednesday, November 2, 2022, Beth McCann sent the following email to the employees of the Denver District Attorney's Office. "*As some of you know, (Y.C) is no longer an employee of this office. Her departure arose as a result of serious allegations made by Ms. (Y.C) against a member of the office. These allegations were investigated over the last two weeks and found not to be true. Ms. (Y.C)'s conduct was not in accordance with the values and standards of this office. While we have discussed this matter with others who were directly involved, please be sensitive to the reputations of those involved and refrain from discussing this matter. If you have any questions please see me, Maggie, or Zach (Liza is out of the office this week).*" Denver District Attorney Elizabeth McCann's intentional choice of several words, including "departure", leads the readers away from the otherwise ineluctable conclusion – (Y.C) was TERMINATED. (Y.C) was "terminated" because she engaged in felonious conduct against the PLAINTIFF. Denver District Attorney Elizabeth McCann instructed the Denver District Attorney employees to protect the reputations of those involved ((Y.C), Beth McCann, and the Denver District Attorney's Office). In September 2021, after the first investigation, Denver District Attorney Elizabeth McCann wasn't concerned about the PLAINTIFF's

reputation and never issued a similar statement "*to be sensitive to the reputations of those involved*". This email, which was biased, offensive, and misleading to several employees, was documented in their written statements. It further proves Denver District Attorney Elizabeth McCann continued to provide (Y.C) with favorable treatment. This further victimized the PLAINTIFF.

85. On Wednesday, November 2, 2022, after (Y.C)'s termination, Senior Criminal Investigator Teresa Aguilar told the PLAINTIFF she had a conversation with at least one attorney in the Denver District Attorney's Office. According to Aguilar, the attorney(s) stated there were still attorneys in the office who expressed distrust in the PLAINTIFF. This assumption of distrust was later documented in a January 10, 2023, written statement by Senior Criminal Investigator Shawna Treasure, who worked with (Y.C) in the Family Violence Unit. McCann's failures from the first sexual harassment investigation (September 2021) and subsequent adverse employment action failed to protect the PLAINTIFF and created a hostile work environment that continued even after (Y.C)'s termination. If McCann had investigated the first sexual harassment investigation, exculpatory evidence would have been examined and proved (Y.C)'s allegations were fabricated. She would have been terminated in September 2021 and the PLAINTIFF would not have been subjected to everything that has occurred since. This further victimized the PLAINTIFF.

86. In two Wednesday, November 2, 2022, **audio-recorded phone calls** (9:48 and 9:26 minutes), Assistant District Attorney Maggie Conboy called the PLAINTIFF's cell phone. Assistant District Attorney Conboy explained she had numerous in-person conversations with Denver District Attorney employees, mainly (Y.C)'s former unit (Family Violence Unit), to explain the second investigation. Although the first sexual harassment investigation was widely known within the office, Conboy's conversations failed to address and/or clear the assumption the PLAINTIFF was guilty. The PLAINTIFF told Assistant District Attorney Conboy about assumptions within the office, as provided by Senior Criminal Investigator Aguilar's statement.

87. In a Tuesday, November 8, 2022, **audio-recorded meeting** (37:52 minutes), Denver District Attorney Elizabeth McCann made comments to the PLAINTIFF that minimized her failures to this point and attempted to justify the acceptance of allegations and McCann's labeling of (Y.C) as a victim without any physical evidence or merit during the first allegation/investigation. Denver District Attorney Elizabeth McCann stated the following personal reasoning, "*….lawyers, in particular, we're sworn to be you know honest and truthful and all of that…*" The PLAINTIFF immediately argued, "*And so are police officers*"; however, in dismissive language, Denver District Attorney's Elizabeth McCann assumed the PLAINTIFF was guilty. Denver District Attorney Elizabeth McCann advised the

PLAINTIFF that he "*wouldn't understand*" and added, "*When you're in
management, this whole sexual harassment thing is so sensitive.*" The PLAINTIFF
reminded McCann that he had retired from the Pennsylvania State Police at the rank
of Captain (Troop Commander) and was the commanding officer of approximately
280 personnel, who were assigned to six State Police Stations, which spanned four
counties. The PLAINTIFF explained the involuntary transfer was punishment and
thus continued to harm the PLAINTIFF, physically, emotionally, and professionally.
Denver District Attorney Elizabeth McCann suggested the PLAINTIFF find methods
of coping and offered a personal story where she disliked a certain defense attorney
when she was a young attorney. She advised she would keep a marshmallow-like
gun in her bag and she would imagine shooting the defense counsel in the head when
he would frustrate her in court.

88. In a Tuesday, November 15, 2022, **audio-recorded meeting** (19:15 minutes),
Denver District Attorney Elizabeth McCann advised the PLAINTIFF she was not
going to pursue criminal charges because she believed (Y.C)'s conduct was not
criminal. She advised the matter would be referred to the Colorado Supreme Court,
Attorney Regulation Counsel (ARC). It should be noted, that this was ethically
REQUIRED. The PLAINTIFF argued anything the ARC would impose would be
administrative and not criminal. The PLAINTIFF argued, that if criminal charges
were filed against (Y.C), the ARC could consider those criminal charges for imposing
punishment. Denver District Attorney Elizabeth McCann agreed.

89. On Wednesday, November 16, 2022, the PLAINTIFF sent an email to Denver
District Attorney Elizabeth McCann and her immediate staff. The PLAINTIFF
advised he was hurt by the decision to not criminally prosecute (Y.C) and again
reiterated his belief that (Y.C)s' actions were criminal on several levels.     In
subsequent CORA requests, **the PLAINTIFF acquired numerous emails from
Denver District Attorney Elizabeth McCann's immediate staff.** These emails
very clearly indicate their belief that (Y.C)'s actions were criminal. Despite
overwhelming physical and digital evidence and staff members who disagreed with
her decision, Denver District Attorney Elizabeth McCann continued to protect (Y.C),
a young female Asian Attorney, with favorable decisions and did not pursue criminal
charges. This further victimized the PLAINTIFF.

90. On or about Wednesday, November 16, 2022, Chief Criminal Investigator Tim
Garner had a private conversation with the PLAINTIFF. Garner asked the
PLAINTIFF how he was doing. The PLAINTIFF expressed frustrations with the
perceived continued preferential treatment towards (Y.C). Garner agreed and opined
(Y.C) was being treated differently because she was a female and an attorney. The
PLAINTIFF confided in Garner about the impact the first investigation (NOT
SUSTAINED) had on him. The PLAINTIFF explained, that between September

2021 and November 2022, when he was unable to prove his innocence through available exculpatory evidence, emotionally he was "*in some pretty dark places*".

91.    On Wednesday, November 16, 2022, Denver District Attorney Elizabeth McCann emailed the PLAINTIFF. She stated, "*Thank you for the email Dan. I had asked Bob Russel to look at this previously. I will ask him to take another look.*" Chief Deputy District Attorney Bob Russel is assigned to the Denver District Attorney's Office Appellate Division and provided Denver District Attorney Elizabeth McCann with legal advice on this matter. It was later learned McCann intentionally withheld critical facts which caused Chief Deputy District Attorney Bob Russel to make an uninformed decision (refer to the November 17, 2022, **audio-recorded meeting** with Chief of Staff Liza Willis).

92.    Chief Criminal Investigator Garner later advised the PLAINTIFF that he ensured he was present for the second meeting with Chief Deputy District Attorney Bob Russell (on November 16, 2022) to ensure all of the facts were provided to Russel.

93.    In a Wednesday, November 16, 2022, **audio-recorded phone call** from Denver District Attorney Elizabeth McCann. (Hines received the phone call from an unknown number on his desk phone). Hines activated his digital recorder. McCann explained the office was going to change its decision and send the investigation(s) for an outside review. Hines explained he believed that was prudent to have an outside agency provide a prosecutorial decision. McCann stated, "*We were always going to refer if we thought there was a potential criminal case. We weren't going to make that ultimate decision, uh, in the office. But we were not going to refer it out because we weren't seeing that um we had the evidence for a criminal case. But going through a little more carefully, uh, we decided that it was, I decided that we would, um, it was better to have it looked at independently and have someone else make the decision about that.*"

94.    In a Thursday, November 17, 2022, **audio-recorded meeting** with Chief of Staff Liza Willis, Willis asked for a few minutes to talk with the PLAINTIFF. Willis then said the PLAINTIFF was "*owed an apology*". Willis stated, "*After the first one I knew there was something hinky*". Willis advised they always knew "*something was weird with Yujin*". Willis reiterated her apologies. Willis stated they knew better because they knew the PLAINTIFF's reputation and his background. Willis stated she has been in contact with Karla Pierce, from the City Attorney's Office. Hines explained he was upset because Denver District Attorney Elizabeth McCann originally stated the office wasn't going to pursue criminal charges. Willis said, "*Rightfully so*" and advised she heard about that when she returned from vacation. Willis stated, "*I was in shock.*" Willis stated, "*because Bob (Russel) counseled her [Beth McCann] and **but she** [McCann] **didn't give Bob all of the facts. And so now***

25

*you know it's reversed*". Willis stated she felt so bad and they knew from the first time "*something was up*". The PLAINTIFF explained the impact of the Adverse Employment Action with the involuntary transfer, "*But I was moved*". Willis admitted that could have been handled either way, with (Y.C) moving or Hines moving. Willis stated, "*Back then, I got to admit. I don't know how much to say. Although Tim and I direct the investigation there's some decisions that we cannot make and we don't follow. And Beth and people were still on the fence back then and that's what lead to that. You're right. You're right, you were moved, and it does look like a punishment. Feels like a punishment.*" Hines explained it has been hard for the past year and a half because he wasn't given the opportunity to prove his innocence. Hines explained he started looking at leaving the office because he didn't want to work here anymore and still had some of those feelings. Hines stated he felt like he was a leper. Hines explained how it has impacted him and how it impacted his social interaction with the office personnel and functions. Willis apologized again that she (the office) that she (Yujin) was "*believable*". Willis stated, "*There were some other signals I received from Yujin back before that all came up.*" Hines asked Willis if she remembered when she saw him in the hall on August 25th, 2021, when she asked him not to keep his head down. Willis remembered that interaction and reiterated her apology. Hines explained it's been difficult. Willis stated, "*I can't even imagine what you've gone through - the worry. I can't even imagine what you've gone through Dan.*" Willis recalled the first sexual harassment investigation, "*Tim and I have always felt this way I remember again the first one and us taking the results back to, to Beth and Zach and, and ah Maggie and said he didn't do this he didn't do this.*" Willis then provided a presumptive quote from Beth McCann, "***But she's a victim***. *And why would she do this? And why would she say?*" Willis stated she told Beth McCann, "*He didn't do this. He didn't. And I'm not going I don't feel comfortable. You want me to do this, but I'm not going to. And. Tim and I you know convinced her. We did meet with the City Attorney, and she said, ah, this doesn't sound like he did it. I said, he didn't Karla. Not from what we got. And he's adamant. And this is not somebody who did something like that or said those things that she is alleging.*" Willis stated, "*I felt it from the first time and that's why Tim and I were adamant we're not doing anything. We can't. Um, there's nothing here. Well, she's.... We're not and so. **I wish we had done more at that time**. Again, my apologies. I would understand if you didn't feel comfortable here. I hope you stay with us.*" Willis acknowledged the gossip in the office and how it has impacted how people look at the PLAINTIFF. Willis advised that the office (Beth McCann) had reversed her position regarding criminal charges. Willis further explained that Bob (Russel) advised McCann along the way. Willis stated, "*Bob was giving her advice. But he didn't have all of the facts.*" **Willis stated before she left for vacation that was the track they were on (to pursue criminal charges). Willis stated she had a conversation with McCann. According to Willis, McCann said, "*By the way, I'm not.*" Willis stated, "*I was stunned. But I figured I was the last to know.*"**

95.   This recorded meeting repeatedly provided:

- Statements that Denver District Attorney Elizabeth McCann was aware of previous issues/warning signs with (Y.C).
- Evidence of Denver District Attorney Elizabeth McCann's preconceived verbal statement(s) that (Y.C) was a victim and the immediate presumption the PLAINTIFF was guilty.
- Confirmation of Denver District Attorney Elizabeth McCann's continued favorable treatment of (Y.C).
- Admissions from the Denver District Attorney's Office failed during the first investigation.
- Admissions of Adverse Employment Action subjected solely to the PLAINTIFF and the appearance that this action was "punishment".
- Acknowledgement of the damaging impact the failed investigation in 2021 and subsequent Adverse Employment Action had on the PLAINTIFF.
- Statements that Denver District Attorney Elizabeth McCann intentionally failed to provide critical facts to Chief Deputy District Attorney Bob Russel before determining to criminal prosecute (Y.C).
- Statements that Denver District Attorney Elizabeth McCann reversed this decision after the critical facts were forced to be provided by Denver District Attorney Elizabeth McCann's immediate staff.
- Articulation that Denver District Attorney Elizabeth McCann's own staff believed (Y.C)'s conduct was criminal.

96.   Chief Criminal Investigator Tim Garner told the PLAINTIFF that the matter was being referred to the Arapahoe County District Attorney's Office for a prosecutorial decision. The Denver District Attorney's Office has a cooperative venture with Arapahoe County. Although this agreement between Denver and Arapahoe County is a partnership, it's not an exclusive path for criminal cases to be reviewed to prosecution.

97.   On Wednesday, November 30, 2022, (419 days after the meeting for the first sexual harassment investigation) Chief Criminal Investigator Tim Garner changed the outcome of the first sexual harassment investigation from NOT SUSTAINED to UNFOUNDED, meaning, "*having no foundation or basis in fact*". This change occurred after the DENVER DISTRICT ATTORNEY's OFFICE finally acquired exculpatory physical evidence that was available to them in September 2021. This was exculpatory evidence Chief of Staff Liza Willis and Chief Criminal Investigator Tim Garner assured the PLAINTIFF they planned to further investigate on September 7, 2021. Before this date, the PLAINTIFF had no means of proving his innocence; therefore, **the evidence was not ripe**. The PLAINTIFF asserts that this act, which

concedes failures and faults, clearly establishes a continuation from the first to the second investigation and simultaneously establishes the 300-day deadline from November 30, 2022. The PLAINTIFF believes the statute of limitations began to run when the adverse employment action acquired some degree of permanence or finality, in this case, November 30, 2022.

98. It should be noted that the September 7, 2021 meeting between Chief of Staff Liza Willis, Chief Criminal Investigator Tim Garner, and the PLAINTIFF was never documented until AFTER the conclusion of the second sexual harassment investigation (November 2022) when the PLAINTIFF submitted an open records request for copies of both investigations. On November 30, 2022, Chief Investigator Tim Garner sent the following email to Chief of Staff Liza Willis. The email contained one document, labeled "*Investigative report – Hines final meeting.docx*"

> **From:** Tim Garner
> **Sent:** Wednesday, November 30, 2022 9:34 AM
> **To:** Liza Willis <Lcw@denverda.org>
> **Subject:** Memo
>
> Sufficient? Short and sweet.



**Tim Garner | Chief Investigator**
Denver District Attorney's Office
201 W. Colfax Avenue, Dept. 801 | Denver, CO 80202
tdg@denverda.org | 720-913-9138 (O) 720-473-1594 (cell)
www.denverda.org

99. The **November 30, 2022,** email from Chief Criminal Investigator Tim Garner contained the following attachment, also dated November 30, 2022. In the attachment, Chief Criminal Investigator Tim Garner documented the following regarding the September 7, 2021 meeting. As previously mentioned, the entirety of this (22:01 minute) meeting on September 7, 2021, was **audio-recorded** by the PLAINTIFF. The email (above) and the document (below) indicate the September 7, 2021 meeting with the PLAINTIFF was NEVER documented before November 30, 2022. Additionally, it proves the Denver District Attorney's Office retroactively attempted to document this meeting with intentional brevity and omissions of critical elements of the meeting. They failed to document the adverse employment action (the involuntary transfer) and their justification for doing so. They failed to document that (Y.C) was "believable" and the PLAINTIFF was not. They failed to document the PLAINTIFF's repeated requests to forensically analyze his phone and Chief of Staff Liza Willis's assurance to the PLAINTIFF, "*And I'd like to see that, and I think you sent it to me. The text. Let's look further into that, can we?*" The only positive

impact this had on the PLAINTIFF was it retroactively changed the conclusion of the first sexual harassment investigation from NOT SUSTAINED to UNFOUNDED.



INVESTIGATIVE REPORT

Re: Dan Hines
    Yujin Choi Sexual Harassment complaint

On September 7, 2021, Chief of Staff Liza Willis and I met with Investigator Dan Hines in the 8th-floor bow conference room regarding this investigation. At that time, Hines was informed that we had completed the investigation. As a result, no disciplinary action was taken. Further, Hines was advised to avoid contact with Choi as much as possible.

This case is concluded as Unfounded.

Date:   November 30, 2022

Tim Garner
Chief Investigator

100. On/around Thursday, December 2, 2022, Denver Assistant District Attorney Zach McCabe sent the following email to Larimer County District Attorney Gordon McLaughlin. It indicates that Denver District Attorney Elizabeth McCann spoke with the Larimer County District Attorney before McCabe's email. The communication Denver District Attorney Elizabeth McCann had with the Larimer County District Attorney's Office was not available (recovered or provided) to the PLAINTIFF under a CORA request. Based upon McCann's previous actions/failures, statements about Denver District Attorney Elizabeth McCann's continued favorable treatment towards (Y.C), audio-recorded statements about McCann's presumption "*But she's a victim*" and assumption the PLAINTIFF was guilty, McCann's documented statements of resistance to pursue criminal charges despite overwhelming physical and digital evidence, audio-recorded statements that documented Denver District Attorney Elizabeth McCann withheld critical facts which swayed the advisement by Chief Deputy District Attorney Bob Russel, that Denver District Attorney Elizabeth McCann's preemptive communication to the Larimer County District Attorney is viewed as yet another act by Denver District Attorney Elizabeth McCann to favorably treat (Y.C). The clear perception is Denver District Attorney Elizabeth McCann was

more concerned with optics, protecting (Y.C), herself, and the Denver District Attorney's Office, instead of pursuing justice and acknowledging the PLAINTIFF was a victim of numerous crimes committed against him in 2021 and 2022. Based upon the previous, Denver District Attorney Elizabeth McCann should have removed herself from the process altogether. The prosecutorial review was assigned to Larimer County Assistant District Attorney Matt Maillaro.

On Fri, Dec 2, 2022 at 10:11 AM Zach McCabe <Zem@denverda.org> wrote:
Gordon,

I hope you are doing well. I understand that Beth and / or Tom Raynes discussed review of a filing decision as a special prosecutor for a potential filing involving an one of our employees. Please let me know who in your office I can send the collected material to.

Thanks,

Zach



**Zach McCabe | Assistant District Attorney**
Denver District Attorney's Office
201 W. Colfax Avenue, Dept. 801 | Denver, CO 80202
Office: 720-913-9255 |Mobile: 303-564-2416
ZEM@DenverDA.org | www.DenverDA.org

101. On Friday, January 6, 2023, Larimer County Assistant District Attorney (ADA) Matt Maillaro sent the following email to Denver County District Attorney Chief Criminal Investigator Tim Garner. This email was recovered by the PLAINTIFF in a CORA request. Maillaro **confirmed (Y.C)'s actions fit the criminal elements** of 18-8-306 (Attempt to Influence a Public Servant) and 18-8-111 (False Reporting to Authorities). But ADA Maillaro expressed his concern if this is a case that should ever see a jury. ADA Maillaro's statement contradicts Denver District Attorney Elizabeth McCann's previous statements that she didn't feel (Y.C)'s actions fit the elements of criminal conduct.

**From:** Matt Maillaro <maillamj@co.larimer.co.us>
**Sent:** Friday, January 6, 2023 12:08 PM
**To:** Tim Garner <Tdg@denverda.org>
**Subject:** Re: Special Prosecution

Tim -

can we do a short virtual meet or telephone call this afternoon or when you are available next week? I just want to briefly discuss 18-8-306 and 18-8-111 with you and get your feeling. I am not worried about the conduct fitting the elements (because it technically does) but more whether this is a case that should ever see a jury.

I don't think we need to discuss the investigation much if at all at this point.

thanks

102. On Friday, January 6, 2023, Chief Criminal Investigator Tim Garner forwarded the aforementioned email from Larimer Assistant District Attorney Maillaro and sent the following email to Denver Assistant District Attorney Zach McCabe. Garner advised McCabe of Maillaro's decision and concern about all witnesses and Subpoena duces tecum (*a subpoena for the production of evidence, is a court summons ordering the recipient to appear before the court and produce documents or other tangible evidence for use at a hearing or trial*). Clearly, ADA Maillaro's legal decision to prosecute or not prosecute (Y.C) was based on optics and not based on whether (Y.C)'s actions fit the elements of criminal conduct but provided concern about the potential embarrassment it would potentially cause any witnesses called by the defense, such as employees of the Denver District Attorney's Office and the simultaneous subpoena of the content of their phones. This further victimized the PLAINTIFF.

**From:** Tim Garner
**Sent:** Friday, January 6, 2023 1:47 PM
**To:** Zach McCabe <Zem@denverda.org>
**Subject:** FW: Special Prosecution

Talked with Matt. He is going to talk with his DA before final decision. Concerned about all witness/SDT's etc that would be filed by defense.

Was wondering what was happening with ARC. Told him I had no idea. Have you heard anything from them?



**Tim Garner | Chief Investigator**
Denver District Attorney's Office
201 W. Colfax Avenue, Dept. 801 | Denver, CO 80202
tdg@denverda.org | 720-913-9138 (O) 720-473-1594 (cell)
www.denverda.org

103. On Friday, January 13, 2023, Chief Criminal Investigator Garner provided the PLAINTIFF with the decision letter by Larimer County ADA Maillaro. Chief Garner expressed his complete disagreement with ADA Maillaro's decision. The decision letter is imbued with numerous instances of intentional or negligent omissions of critical facts. ADA Maillaro even defended (Y.C)'s actions as she became "*less interested*" in the investigation as it progressed. In what world does the criminal justice system make a prosecutorial decision based upon the suspect becoming "less interested" in an investigation that could potentially prosecute them? Paragraph 2 of

ADA Maillaro's *Legal Conclusion – decision to not file criminal charges* stated, "***The conduct here is morally, professionally, and ethically concerning, but for all the reasons stated above, I do not believe the conduct rises to the threshold of criminal charges***".

<div style="border:1px solid black">
The conduct here is morally, professionally, and ethically concerning, but for all the reasons stated above, I do not believe the conduct rises to the threshold of criminal charges.
</div>

104. The last statement in ADA Maillaro's decision letter also contradicts his January 6th email he privately sent to Chief Criminal Investigator Tim Garner, "*I just want to briefly discuss 18-8-306 and 18-8-111 with you and get your feeling. I am not worried about the conduct fitting the elements (because it technically does) but more whether this is a case that should ever see a jury.*"

105. Through CORA requests, the PLAINTIFF recovered evidence about cases that were referred OUT for consideration of criminal prosecution between January 2021 and November 2024. The Denver District Attorney's Office has referred over 1,200 cases for consideration of Special Prosecution that **resulted in no criminal prosecution**. During this same timeframe, the Denver District Attorney's Office has also referred over 1,200 cases for consideration of Special Prosecution **that resulted in criminal prosecution**. It also showed there have been NO CASES referred from the Larimer County District Attorney's Office TO the Denver District Attorney's Office during this same time frame.

106. The evidence that also showed only **one case since 2021** (Juvenile Case - 21JD000158) was referred to the Larimer County District Attorney's Office. This substantiates the PLAINTIFF's assertion that there is no documentation or communication to validate or substantiate the assignment of the Larimer County District Attorney's Office to review this investigation for a prosecutorial decision. The decision to have Larimer County review this case was "cherry-picked" for favorable consideration.

107. A review of public records identified known connections between the Denver District Attorney Elizabeth McCann and the Larimer County Assistant District Attorney Matt Maillaro. These connections include political associations, political projects, and financial donations to political campaigns.

   • According to public records, Daniel Aschkinasi, from Civic Centered Consulting, LLC, served as ADA Matt Maillaro's campaign spokesperson in a bid for election in the 18th Judicial District in 2020.

- According to public records, Daniel Aschkinasi, from Civic Centered Consulting, LLC, also served as District Attorney Beth McCann's campaign manager in her bid for election as the District Attorney.
- According to Colorado TRACER, which is managed by the Colorado Secretary of State, on March 16, 2020, Denver District Attorney Elizabeth McCann made a $400 campaign donation to ADA Maillaro's political campaign fund during his bid for election as the District Attorney in the 18th District (Arapahoe County).
- Aside from the top eight contributions (all eight were made by Maillaro himself) to ADA Maillaro's campaign fund, District McCann's donation tied for the next highest donation to Maillaro's campaign fund.

| CONTRIBUTOR | AMOUNT | DATE | RECIPIENT |
|---|---|---|---|
| Matthew Maillaro | $45000 | 06/10/2020 | Matthew Maillaro for DA |
| Matthew Maillaro | $35000 | 06/05/2020 | Matthew Maillaro for DA |
| Matthew Maillaro | $30000 | 06/17/20202 | Matthew Maillaro for DA |
| Matthew Maillaro | $25000 | 12/30/2019 | Matthew Maillaro for DA |
| Matthew Maillaro | $15000 | 08/02/2019 | Matthew Maillaro for DA |
| Matthew Maillaro | $10500 | 07/15/2020 | Matthew Maillaro for DA |
| Matthew Maillaro | $10000 | 04/21/20202 | Matthew Maillaro for DA |
| Matthew Maillaro | $500 | 04/12/2019 | Matthew Maillaro for DA |
| Elizabeth McCann | $400 | 03/16/2020 | Matthew Maillaro for DA |

- According to Colorado TRACER, District Attorney McCann has made the following political contributions to the campaign funds for the following sitting District Attorneys and Assistant District Attorneys in neighboring and nearby counties. This chart shows Elizabeth McCann hasn't made political contributions to all political campaigns.

| CONTRIBUTOR | RECIPIENT | AMOUNT | COUNTY | DATE |
|---|---|---|---|---|
| Beth McCann | Alexis King | $400 | Jefferson, Gilpin | 04/29/2019 |
| Beth McCann | Matthew Maillaro | $400 | Larimer | 03/16/2020 |
| Beth McCann | Heidi McCollum | $400 | Clear Creek | 03/16/2020 |
| Beth McCann | Brian Mason | $200 | Adams | 09/17/2020 |
| Beth McCann | Gordon McLaughlin | $200 | Larimer | 09/17/2020 |
| Beth McCann | Michael Dougherty | $0 | Boulder | |
| Beth McCann | Michael Rourke | $0 | Weld | |
| Beth McCann | John Keller | $0 | Arapahoe, Douglas, Elbert, Lincoln | |
| Beth McCann | Michael Allen | $0 | El Paso, Teller | |
| Beth McCann | Travis Sides | $0 | Logan Morgan, Phillips, Washington, | |

| | | Sedgwick, Yuma, Kit Carson | |
|---|---|---|---|

108. All of these connections were fully documented in more detail in the document *"Allegation of collusion between the Denver District Attorney and the Larimer County Assistant District Attorney"*.   The Denver District Attorney Elizabeth McCann should have ensured the review for a special prosecution went to a reviewer with whom she doesn't share identified connections, especially when there are countless documented statements that McCann has continually made comments and decisions that favored (Y.C).

109. The published decision by ADA Maillaro was uniquely shared by Beth McCann alone.   The PLAINTIFF has spoken with numerous people, including within her immediate staff, who have all expressed their disbelief that (Y.C) was not criminally charged.   If (Y.C) had been criminally charged, it would adversely impact the decision by the Attorney Regulation Counsel (ARC) regarding (Y.C)'s conduct.   It would have embarrassed Denver District Attorney Elizabeth McCann since she had previously opined that (Y.C)'s conduct was not criminal.   It would have embarrassed the Denver District Attorney's Office.

110. A justified criminal prosecution of (Y.C) would have created a prosecutorial ethical dilemma and potentially created a monumental amount of criminal conviction appeals, with all of the criminal cases (over 350) (Y.C) has handled since the beginning of her employment in 2019.

111. A justified criminal prosecution would also have adversely impacted any unemployment claim filed by (Y.C).   On/about November 8, 2022, (Y.C) filed for unemployment compensation through the Colorado Department of Labor.   On February 8, 2023, the Colorado Department of Labor approved (Y.C)'s unemployment claim and she received financial benefits.   This jaded decision by ADA Maillaro continued to provide (Y.C) with favorable decisions and further victimized the PLAINTIFF.   If (Y.C) had been criminally charged, it would have disqualified her from any Colorado Unemployment compensation, which states,"

112. Title 8 - Labor and Industry, Article 73 - Benefits - Eligibility - Disqualification, § 8-73-108,
   - *(3)(c), "The gross misconduct of an individual causing his discharge from employment shall result in a disqualification of twenty-six weeks. "Gross misconduct" means conduct evincing such willful or wanton disregard of an employer's interests **or negligence or harm of such a degree** or recurrence **as to manifest culpability or wrongful intent**, or assault or threatened assault*

*upon supervisors, coworkers, or others at the work site".*

- *(5)(e)(VII), "Violation of a statute or of a company rule which resulted or could have resulted in serious damage to the employer's property or interests or could have endangered the life of the worker or other persons, such as: Mistreatment of patients in a hospital or nursing home; serving liquor to minors; selling prescription items without prescriptions from licensed doctors;* **immoral conduct which has an effect on worker's job status;** *divulging of confidential information which resulted or could have resulted in damage to the employer's interests; failure to observe conspicuously posted safety rules;* **intentional falsification of** *expense accounts, inventories,* **<u>or other records or reports</u> whether or not substantial harm or injury was incurred;** *or removal or attempted removal of employer's property from the premises of the employer without proper authority".*

- (5)(e)(X) "*Incarceration after conviction of a violation of any law,* **or loss of license, certification, credential, condition, or other professional designation that is essential to job performance."**

- *(5)(e)(XIV) "Rudeness, insolence,* **or offensive behavior** *of the worker not reasonably to be countenanced by a customer, supervisor, or fellow worker;*

113. On Wednesday, April 12, 2023, the PLAINTIFF was subjected to retaliatory actions/statements in the form of passive/aggressive comments by Assistant District Attorney Maggie Conboy. The PLAINTIFF walked to the coffee machine/break area on the 8th floor. As he approached the break area, he noticed Assistant District Attorney Maggie Conboy speaking to someone else who was just out of his view. They finished their conversation and Conboy turned towards the PLAINTIFF just as he was about to approach the coffee machine. As Conboy turned towards the PLAINTIFF, he noticed Conboy's face immediately went from a relaxed expression to a very stern look. The PLAINTIFF sensed animosity. The PLAINTIFF motioned his arm/hand towards the coffee machine, for her to go first, and the PLAINTIFF walked a few feet away to the windows and to give Conboy space. A few seconds later, the PLAINTIFF heard, "*Dan?*" He turned around and replied, "*Yes ma'am*". As she held her coffee, Conboy stated, "*When I called you, it was as a friend.*" Confused, the PLAINTIFF said, "*Excuse me?*" She repeated, "*When I called you that night, it was as a friend.*" Without providing any time for the PLAINTIFF to respond, Conboy immediately turned and walked away. As the PLAINTIFF was pouring his coffee, he heard a door slam shut in the direction of Conboy's office. The PLAINTIFF had come from that direction and knew no one was in the few offices between the coffee area and Conboy's office. A few moments

later, the PLAINTIFF walked past her office, and her door was now closed. The PLAINTIFF realized Conboy's hostility towards him was because Conboy was now aware the PLAINTIFF recorded Conboy when she called the PLAINTIFF on November 2, 2022 (after business hours) and explained her **official actions** that day. This hostility toward the PLAINTIFF was immediately documented and sent in an email to Denver District Attorney Elizabeth McCann and her staff. Due to stress, anxiety, and depression, the PLAINTIFF took Personal Time Off (PTO) for the remainder of the day.

114. In a May 2023 conversation with Chief Criminal Investigator Tim Garner, Garner still believed criminal charges should have been filed against (Y.C). Chief Criminal Investigator Garner pointed out that the office doesn't submit search warrants (for phone records) for Internal Investigations, nor would the court approve a search warrant for an "internal" investigation.

115. On Thursday, May 18, 2023, the PLAINTIFF filed a formal complaint with the Equal Employment Opportunity Commission (EEOC) – Denver Office.

116. On Tuesday, May 23, 2023, the PLAINTIFF was subjected to a retaliatory statement by Chief Deputy District Attorney Phil Reinert. Just outside the office building, the PLAINTIFF was having a private conversation with Deputy District Attorney Sam Shivley. During this conversation, Shivley expressed his apology and compassion to the PLAINTIFF for everything he has been through. Shivley also expressed his disbelief that (Y.C) was not criminally charged. Chief Deputy District Attorney Reinert walked past the PLAINTIFF and Shively and asked what they were doing. Chief Deputy District Attorney Reinert then asked them, "***Are you guys checking out and whistling at the girls as they pass by?***" The PLAINTIFF responded, "*Chief, under recent events and allegations, I will refrain from even commenting on that.*" Reinert's statement was witnessed by Deputy District Attorney Sam Shivley. The PLAINTIFF immediately documented this incident and submitted it to the EEOC.

117. On Thursday, June 1, 2023, the PLAINTIFF sent Larimer County ADA Maillaro an email to inquire about his CORA request for "*any correspondence (electronic and non-electronic) that ADA Maillaro had with any employee of the Denver District Attorney's Office regarding this matter*". ADA Maillaro responded and **refused** to provide the PLAINTIFF with any correspondence. ADA Maillaro alleged all correspondence(s) were considered "***work product***" and protected under **C.R.S. § 24-72-202 (6)(a)(II) and (6.5)(a).**

118. As the **Assistant** District Attorney, ADA Maillaro is not an "**elected** official"; therefore, he is not protected under the umbrella of **C.R.S. § 24-72-202 (6)(a)(II) and (6.5)(a),** which states in part, "*for the benefit of **ELECTED** officials, which*

when employers create **or permit** abusive work conditions.  As the Court is aware, a hostile work environment under Federal and Colorado employment law arises when offensive behavior alters the terms, conditions, or privileges of the employment. **There is no exact list of circumstances that create a hostile work environment.** A core question is how the behavior affected the employee.  A hostile work environment claim does not require a tangible employment act or a discrete economic harm to the employee.  It is enough that the employee experienced psychological harm as a result of the toxic environment.  An employee need not even quit a job to avoid a hostile work environment. The ultimate standard is whether the behavior explicitly or constructively altered the terms and conditions of employment. Burlington Indus., Inc. v Ellerth, 524 U.S. 742, 752 (1998).  An employer may implement an adverse, tangible employment action as part of the harassment or **simply allow the employee to suffer a hostile work environment**.

123. The PLAINTIFF asks the Court to conclude the actions/inactions by the City and County of Denver, the Denver District Attorney's Office, and Denver District Attorney Elizabeth McCann were egregious and prove they took an action/inaction or **engaged in a course or pattern of conduct** that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of the PLAINTIFF's employment.   The adverse employment action **included conduct that was reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion**. These facts are identified in the PLAINTIFF's timeline, the PLAINTIFF's original Charge, the supplemental charge against the Larimer County District Attorney, acquired documents, emails, written and verbal statements, and numerous audio recordings of conversations the PLAINTIFF had with Denver District Attorney Elizabeth McCann and her command staff. These facts conclusively prove the City and County of Denver, the Denver District Attorney's Office, and Denver District Attorney Elizabeth McCann violated Title VII and that the burden has been more than sufficiently met.  Additionally, the PLAINTIFF asks the Court to conclude that both the adverse employment actions began with the first sexual harassment investigation and continued to/through the second sexual harassment. The outcome of the first investigation was also retroactively changed on November 30, 2022, a month after the conclusion of the second investigation.  The allegations/investigations and the course of conduct were continuing.  As such, these also exceed the burden for violations under Title VII.

## E.    REQUEST FOR RELIEF
*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

WHEREFORE, The PLAINTIFF prays that the agencies and individuals identified herein, the City and County of Denver, the Denver City Attorney's Office, and the Denver District Attorney Elizabeth McCann be ordered by the Court to provide all relief proved by the PLAINTIFF to be actionable and within the Court's power to remediate.

## F.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
(Plaintiff's signature)

*DECEMBER 16, 2024*
_____
(Date)

(Revised February 2022)