Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

To respond to the Denver District Attorney (DDA) Office, the statement from the Respondent, and provide the Commission further evidence to establish a prima facia case of discrimination under Title VII, the Charging Party (CP) provides the following response. Although the CP's Charge and submitted documentation, written statements, and audio recordings have previously provided the Commission with tangible evidence, the CP respectfully asks the Commission to carefully review the following document, refer to the aforementioned evidence, and listen to the audio recordings. As the Commission is aware, a discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Title VII bars conduct that would seriously affect a **reasonable person's** psychological well-being, but the statute is not limited to such conduct. If the environment would **reasonably be perceived** and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious. The CP believes, that once the Commissions reviews the totality of all of the following circumstances, they will conclude the frequency of the discriminatory conduct; its severity; it was physically threatening or humiliating, whether it contained offensive utterance(s), and whether it unreasonably interfered with the CP's work performance. The effect on the CP's well-being is relevant to determining whether the CP actually found the environment abusive. While psychological harm, like any other relevant factor, may be taken into account, no single factor is required. (Harris, supra, 510 U.S. at pp. 21-23). Additionally, at the conclusion of the first sexual harassment investigation (September 2021), the CP was very vocal about the investigation's failures and provided the DDA with a theory of what was happening. Ironically, in November 2022, the CP's theory was 100% accurate. If Beth McCann had thoroughly investigated the first sexual harassment investigation and explored exculpatory evidence (as repeatedly offered by the CP), the accuser (Choi) would have been terminated in September 2021 and the following events would never have occurred. During this recored conversation in September 2021, the CP repeatedly communicated his concerns and was provided with statements of Beth McCann's favorable treatment and comments about Choi and subsequently demonized the CP. It is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawfully discriminatory manner." ( *Garcia-Paz, supra,* 873 F.Supp. at p. 560.)

The CP's allegation of reverse discrimination and imposition of an adverse employment action against the CP is well documented through the CP's own continued work product timeline, which is abbreviated in the CP's Charge and filed with the Commission on May 18, 2023. The CP asserts the first (August 2021) and the second (November 2022) sexual harassment investigations **are related,** and the events documented hereafter establish a continuing course between both allegations. Both involve the same employer – the Denver District Attorney's Office (DDA) (Denver District Attorney Beth McCann). Both involve the same victim – the CP, a Criminal Investigator at the DDA office. Both involve the same accuser – former DDA Deputy District Attorney Yujin Choi. The failures of Beth McCann and the presumption of Choi's innocence and the CP's guilt during the first investigation were not only prejudicial against the CP, they violated Title VII, but also created a continuing hostile work environment for the CP to and through November 2022.

The CP also provided the Commission with numerous written statements from current and past employees who have provided the Commission with their witness accounts of the Adverse Employment Action imposed by Beth McCann, the presumption the CP was guilty, the vilification of the CP, the hostile work environment the CP was forced to work in, and the preferential treatment of Choi, based on her age, gender, ethnicity, and position in the office. The CP's Charge was later supplemented on July 31, 2023, to include the charge against the Larimer County District Attorney's Office.

The Respondent, the City Attorney's Office (CAO), made numerous statements in their Position Statement about the involvement of the **Jefferson** County District Attorney's Office. To the best of the CP's knowledge, the **Jefferson** County District Attorney's Office was not involved in this matter. These are confusing, inaccurate, and believed to be false statements by the Respondent.

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

The CP's Charge provides conclusive evidence of adverse employment action. The facts prove the Denver District Attorney has taken an action or **engaged in a course or pattern of conduct** that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of the Charging Party's employment. The adverse employment action **included conduct that was <u>reasonably likely</u> to impair a reasonable employee's job performance or prospects for advancement or promotion**. These facts are identified in the CP's timeline, the CP's Charge, the supplemental charge, acquired documents, emails, written and verbal statements, and numerous audio recordings of conversations the CP had with DDA Beth McCann and her command staff.

According to the Respondent, the CP must establish the following for a prima facia case of discrimination under Title VII:
1. He is a member of a protected class.
2. He was qualified for the position he held and was performing satisfactorily.
3. He suffered an adverse employment action.
4. The adverse action occurred in circumstances giving rise to an inference of discrimination.

In response to each of the aforementioned prongs cited in the Respondent's Statement, each is addressed to provide the Commission with further evidence and individually respond to the Respondent's anecdotal assertions:

I.   **He is a member of a protected class.**
1. At the time of the first allegation in August 2021, the CP was 50 years old. He is currently 52 years old. The CP is male. The CP is Caucasian. The CP does have a verified physical disability listed with the Veterans Administration; however, is not claiming bias based on said disability. Although the employment position is not a "*protected class*" the CP is a retired Pennsylvania State Trooper and works as a Criminal Investigator at the DDA. It is well known and discussed among DDA office personnel that attorneys are more favorably treated than other staff members, like investigators, secretaries, and victim advocates. In an audio-recorded statement(s) from Beth McCann she believes people based on their position, in this case, Choi was an attorney. The CP is also prepared to provide witness testimony of this fact.

2. At the time of the first and second sexual harassment allegations, Yujin Choi was believed to be in her late 20s. Choi is an adult female. Choi is Asian. Choi held the position of Deputy District Attorney.

II.  **He was qualified for the position he held and was performing satisfactorily.**
1. From 1990-1999, the CP served in the United States military. This service included achieving a Top Secret/SCI clearance with *Yankee White* endorsement (White House clearance). For most of his military service, the CP served in the Military Police Corps. The CP was also selected to serve with the "*The Old Guard*", which is known as "*The Army's Official Ceremonial Unit and Escort to the President*". During his assignment to *The Old Guard*, the CP was assigned Honor Guard duties at Arlington National Cemetery and throughout the Military District of Washington. The CP had an impeccable military career.

2. From 1999-2019 - The CP honorably served with the Pennsylvania State Police. In 2019, he retired from the Pennsylvania State Police, achieving the rank of Captain. During his career with the State Police, the CP served as a Trooper – Patrol Unit, Trooper - Criminal Investigation Unit, Corporal - Patrol Unit Supervisor, Sergeant - Bureau of Integrity and Professional Standards, Lieutenant – Staff Section Commander, Lieutenant – Station Commander, Lieutenant – Patrol Section Commander, and Captain – Troop Commander. As a Troop Commander, the CP was the Commanding Officer of approximately 280 personnel who were stationed at six State Police Facilities and spanned four counties. The CP has investigated

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

numerous serious cases, including Homicide, Suicide, Officer-Involved Shootings, Aggravated Assaults, Homicide by Vehicle. Your Affiant has been the Commanding Officer of the following units, the Major Case Team, Patrol Sections, Criminal Sexual harassment investigations Section, Staff Section, Forensic Services Unit, Collision Analysis and Reconstruction, Vehicle Fraud Investigators, Intelligence Unit, Vice/Narcotics Unit, Firearms, Special Projects, Polygraph Unit, Fire Marshal Unit, Evidence (property rooms), K-9 teams, and Drug Recognition Experts (DRE). Aside from the completion of the Pennsylvania State Police Academy, the CP successfully completed over 800 hours of in-service and advanced training courses, including the FBI National Academy (FBINA 265) in 2016. The CP had an impeccable career with the Pennsylvania State Police.

3. In 2019 - the CP successfully completed the Colorado Police Officer's Standards and Training (POST) Academy, at his expense, and has held full Colorado POST certification since his graduation.

4. The CP completed the entire application process for the position of Senior Criminal Investigator with the Denver District Attorney's office and was hired in August 2019.

5. The CP was asked to participate in the hiring process (interview board) for numerous DDA Criminal Investigators. The CP also created a uniform interview form/questions to utilize during this process.

6. The CP was asked by the Chief Criminal Investigator Tim Garner to participate in a discussion about creating a supervisor rank within the DDA Criminal Investigations Unit. The CP subsequently provided a written job description proposal and flow chart depicting the proposed rank structure for the entire Criminal Investigations Unit (approximately 38 personnel).

7. Chief Criminal Investigator Tim Garner provided the following statement in the CP's 2021 Evaluation Report, "*Investigator Hines starts with a basket of lemons and makes lemonade on a weekly, if not daily basis. His determination, grit, thoughtfulness, compassion, respectfulness, drive and humility are unmatched in the investigator corp. The City of Denver Stars rating category for Exceptional is modeled after Dan Hines.*"

8. The following chart depicts the CP's annual evaluation ratings since his employment began with the DDA.

| YEAR | MANAGER OVERALL EVALUATION RATING | CALCULATED RATING | MANAGER EVALUATION | CASE INVESTIGATION | CONDUCT, POLICIES, PROCEDURES, AND RULES | OTHER DUTIES AS ASSIGNED REQUESTED | SAFETY | TRIAL/HEARING PREPARATION (UNIT ASSISTANCE) | TRIAL/HEARINGS (GRAND JURY AND COURT) | WARRANTS AND PRODUCTION OF RECORDS | WITNESS TRAVEL ARRANGEMENTS |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 2019 | 4.36 | 4.45 | EXCEEDS EXPECTATIONS | EXCEPTIONAL | EXCEPTIONAL | EXCEEDS EXPECTATIONS | SUCCESSFUL | EXCEPTIONAL | NOT RATED | NOT RATED | SUCCESSFUL |
| 2020 | 4.00 | 4.00 | EXCEEDS EXPECTATIONS | EXCEPTIONAL | EXCEEDS EXPECTATIONS | EXCEPTIONAL | SUCCESSFUL | EXCEEDS EXPECTATIONS | SUCCESSFUL | NOT RATED | NOT RATED |
| 2021 | 3.96 | 3.70 | EXCEEDS EXPECTATIONS | EXCEEDS EXPECTATIONS | SUCCESSFUL | EXCEEDS EXPECTATIONS | EXCEEDS EXPECTATIONS | EXCEEDS EXPECTATIONS | SUCCESSFUL | EXCEEDS EXPECTATIONS | NOT RATED |
| 2022 | 3.00 | 3.40 | SUCCESSFUL | EXCEEDS EXPECTATIONS | EXCEEDS EXPECTATIONS | EXCEEDS EXPECTATIONS | SUCCESSFUL | SUCCESSFUL | SUCCESSFUL | EXCEEDS EXPECTATIONS | NOT RATED |

**III.  He suffered an Adverse Employment Action** (*combined with IV*).
**IV.  The adverse action occurred in circumstances giving rise to an inference of discrimination.**
As the Commission is aware, Adverse employment actions are not limited to ultimate actions such as termination or demotion. There is an adverse employment action if the Denver District Attorney has

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

taken an action or **engaged in a course or pattern of conduct** that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of the Charging Party's employment. An adverse employment action **includes conduct that is <u>reasonably likely to impair a reasonable employee's job performance</u> or prospects for advancement or promotion**. These can include:

- ➤ Non-selection
- ➤ Firing
- ➤ Failure to promote.
- ➤ Demotion
- ➤ Suspension
- ➤ **Undesirable reassignment**

The City of Denver Ethics Handbook (page 88) defines Adverse Employment Action as "*any direct or indirect form of employment discipline or penalty, including, but not limited to, dismissal, suspension, demotion, transfer, reassignment, official reprimand, adverse performance evaluation, withholding of work, denial of any compensation or benefit, layoff, or threat of any such discipline or penalty*".

The Respondent's statement repeatedly omitted certain aspects of the City of Denver Ethic's definition. Their definition quoted, "*significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits*".

The Respondent alleged all of the CP's allegations from the first sexual harassment allegation are time-barred because they allege the CP failed to file his charge within 300 days from September 2021. However, the CP alleges the actions of the DDA, which originally began in August 2021 (the start of the 2021 investigation) were ongoing and continued even past the second sexual harassment investigation. Additionally, on November 30, 2022, the DDA retroactively changed the first ruling of the first sexual harassment investigation from September 2021. Both instances are connected and therefore the CP's original Charge was filed well within the 300-day limitation. The CP asserts that any reasonable person, upon reading the CP's original charge, combined with this Response, would easily conclude the CP was subjected to an adverse employment action which was imposed by the DDA, Beth McCann.

1. In August 2021, at the initiation of the first sexual harassment investigation, DDA Beth McCann engaged in a course or pattern of conduct that subjected the CP to adverse employment action and imposed a subsequent hostile work environment which continued past the conclusion of the second sexual harassment investigation.

2. In August 2021, DDA Beth McCann violated the CP's rights, as protected under *Garrity v. New Jersey*. The CP was never advised of his rights under *Garrity v. New Jersey*. The CP was confronted in his office by the senior ranking command staff of the DDA. The CP feared his job was in jeopardy.

3. In August 2021, the CP was repeatedly subjected to insinuated questions, disbelief, and immediate blame during the first sexual harassment investigation by members of DDA Beth McCann's staff. Assistant District Attorney Zach McCabe insinuated the CP's guilt and asked the CP if there was anything the CP needed to tell them (insinuating the CP had done something inappropriate). ADA McCabe also insinuated the CP's guilt when he asked the CP, "*Don't you think it took a lot of courage for her [Choi] to come forward?*"

4. DDA Beth McCann's presumption and subsequent treatment that the CP was guilty during the first sexual harassment investigation was later documented in a November 17, 2022, **audio-recorded** (36:21 minutes) meeting with Chief of Staff Liza Willis, after the conclusion of the second sexual harassment investigation.

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

5.  On August 25, 2021, the CP exited his office and turned to walk toward a nearby copier room. At the same time, Chief of Staff Liza Willis was walking towards the CP from the other direction. As they passed, Willis said hello. The CP didn't look up from his fixed stare at the floor. The CP entered the copier room and retrieved his paperwork. As the CP exited the copier room to head back to his office, he noticed Willis standing next to his office door and staring at him. As the CP approached his office, Willis asked if she could talk to him. The CP agreed and Willis suggested they walk into his office. Willis began the conversation and said, "*Please don't hang your head like that*" and added that it bothers her to see the CP walking around like that. The CP asked her, "*What do you expect me to do?*" and emotionally broke down. During the conversation, the CP professed his innocence. Willis suggested, "*Please, go talk to Beth (McCann)*". The CP asked what he needed to talk to McCann about. Willis explained Beth McCann may be able to explain things to the CP. The CP explained he didn't need to talk to McCann because the decision (to involuntarily transfer the CP) was already made, and he was made to feel embarrassed and ashamed. Chief of Staff Willis walked the CP over to the eastern side of the building to identify what office the CP was supposed to move to. The impact of this was later discussed during a November 17, 2022 **audio-recorded meeting** with Chief of Staff Liza Willis.

6.  On August 25, 2021, DDA Beth McCann imposed an adverse employment action upon the CP - an involuntary transfer/reassignment (less desirable) as a result of the first sexual harassment investigation. Approximately three weeks before the first sexual harassment investigation was initiated, the CP had requested (and was approved) a new (preferred) assignment.

7.  This permanent adverse employment action involuntarily forced the CP to reassignment to a different office, different courtroom assignments, different investigations, different supervisors, and different DDA Office personnel.

8.  This adverse employment action toward the CP created the immediate impression within the DDA Office that the CP was guilty and simultaneously created a hostile work environment that spanned from the first sexual harassment investigation (September 2021) through the second sexual harassment investigation (November 2022). The impression of guilt and the creation of a hostile work environment is well documented in the CP's Charge and in the numerous written statements provided to the Commission. These statements are from DDA employees who witnessed and heard the discussions and assumptions of guilt toward the CP. The CP is prepared to provide testimony from numerous present and past employees who witnessed the hostile environment imposed on the CP and created by Beth McCann and her immediate staff. Beth McCann's immediate staff have themselves told the CP of their own witness accounts during **audio-recorded meetings** and expressed their observations of the negative impact the adverse employment action and subsequent hostile work environment had on the CP.

9.  In a September 7, 2021, **audio-recorded meeting** (22:01 minutes), the CP repeatedly professed his innocence with DDA Chief of Staff Liza Willis and Chief Criminal Investigator Tim Garner. The CP repeatedly stated the sexual harassment allegations against him were fabricated. The CP repeatedly stated he never sent text messages to Choi. The CP repeatedly suggested Choi fabricated a phone contact with his name and texted herself to purport the CP was sexually harassing her. The CP repeatedly reminded Chief of Staff Willis and Chief Investigator Garner he asked for a forensic analysis on his phone to prove his innocence. After the CP repeatedly advised a person can fabricate a phone contact and text themselves, Chief of Staff Liza Willis told Chief Criminal Investigator Tim Garner, "*Remind me, I want to look further into that*". Chief of Staff Willis told the CP that the DDA assumed Choi's innocence and stated, "*There was a reason for believing her [Choi]*". This insinuated the CP was not believable and guilty, albeit the DDA had no evidence. The CP was advised to avoid contact with Choi. The CP was told the involuntary transfer/reassignment was done "*to make her [Choi] feel*

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

*comfortable*". The CP was originally told the involuntary transfer/reassignment was done to protect him. The CP explained any distance would not stop a fictitious allegation. (Ironically, this statement became reality in October 2022, because Beth McCann favorably treated Choi and **failed to protect the CP** and investigate available exculpatory evidence which would have caused Choi's termination in September 2021). Chief of Staff Liza Willis told the CP he had no choice in the involuntary transfer/reassignment. The CP stated he believed the involuntary transfer was "*punishment*". The CP inquired why nothing was done to Choi. The CP stated he was aware Choi had made previous allegations against other people within our office and outside the office, including a sitting Denver County Judge. Chief of Staff Liza Willis told the CP he was moved "*to make her [Choi] feel comfortable*". The CP stated he was already facing the perception of guilt from coworkers. This perception of guilt was created by the adverse employment action by DDA Beth McCann. The CP repeatedly stated he viewed it as punishment. The CP stated, "*The thing about it is, for the rest of my life, I will have a tarnished career. I will have an allegation against me that I can't disprove. I wanted nothing more than to disprove. To be able to dump my phone. To be able to dump the emails.*" The CP asked for a copy of the investigative report, but his request was denied by Chief of Staff Liza Willis. Chief of Staff Liza Willis then stated to Chief Investigator Tim Garner, "*And I'd like to see that, and I think you sent it to me. The text. Let's look further into that, can we?*" The CP believed the DDA Office was going to look further into the alleged text(s). The CP advised he was planning on talking to an attorney because he felt he was wronged. At closing, Chief of Staff Liza Willis stated, "*I wish it had not come down to this. I am sorry. I don't know why you are getting targeted or why you were.*" Again, this entire meeting was audio recorded.

10. Based upon the aforementioned audio-recorded conversation from September 7, 2021, the CP was under the impression DDA Beth McCann and her staff were going to further investigate the CP's assertions that Choi had fabricated a phone contact, texted herself, and alleged it was sent by the CP. Unbeknownst to the CP in the months to follow, this was never done.

11. In September 2021, the first sexual harassment investigation was initially ruled, "NOT-SUSTAINED", which means, "*Insufficient evidence to either prove or disprove that a violation occurred*". If a proper investigation had been conducted at the time, it would have provided conclusive evidence the CP was innocent, and the investigation would have concluded as "UNFOUNDED". Ironically, the outcome of the first sexual harassment investigation was changed after the conclusion of the second sexual harassment allegation (419 days later).

12. It should be noted that the aforementioned meeting between Chief of Staff Liza Willis, Chief Criminal Investigator Tim Garner, and the CP was never documented until AFTER the conclusion of the second sexual harassment investigation (November 2022) when the CP submitted an open records request for copies of both investigations. On November 30, 2022, Chief Investigator Tim Garner sent the following email to Chief of Staff Liza Willis. The email contained one document, labeled "*Investigative report – Hines final meeting.docx*"

> **From:** Tim Garner
> **Sent:** Wednesday, November 30, 2022 9:34 AM
> **To:** Liza Willis <Lcw@denverda.org>
> **Subject:** Memo
>
>
> Sufficient? Short and sweet.

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023



**Tim Garner | Chief Investigator**
Denver District Attorney's Office
201 W. Colfax Avenue, Dept. 801 | Denver, CO 80202
tdg@denverda.org | 720-913-9138 (O) 720-473-1594 (cell)
www.denverda.org

13. The aforementioned email from Chief Criminal Investigator Tim Garner contained the following attachment, **dated November 30, 2022**. Chief Criminal Investigator Tim Garner documented the following regarding the September 7, 2021 meeting. As previously mentioned, the entirety of this (22:01 minute) **audio-recorded** meeting was previously provided to the Commission. Clearly, the email (above) and the document (below) indicate the September 7, 2021 meeting with the CP was NEVER documented before November 30, 2022. Additionally, it proves the DDA retroactively attempted to document this meeting with intentional brevity and omissions of critical elements of the meeting. They failed to document the adverse employment action (the involuntary transfer) and their justification for doing so. They failed to document that Choi was "believable" and the CP was not. They failed to document the CP's repeated requests and Chief of Staff Liza Willis's assurance to the CP, "*And I'd like to see that, and I think you sent it to me. The text. Let's look further into that, can we?*" The only positive impact this had on the CP was it retroactively changed the conclusion of the first sexual harassment investigation from NOT SUSTAINED to UNFOUNDED.

---



INVESTIGATIVE REPORT

Re: Dan Hines
    Yujin Choi Sexual Harassment complaint

On September 7, 2021, Chief of Staff Liza Willis and I met with Investigator Dan Hines in the 8th-floor bow conference room regarding this investigation. At that time, Hines was informed that we had completed the investigation. As a result, no disciplinary action was taken. Further, Hines was advised to avoid contact with Choi as much as possible.

This case is concluded as Unfounded.

Date:  November 30, 2022

Tim Garner
Chief Investigator

---

14. The CP was unaware Beth McCann and her staff failed (or refused) to explore available exculpatory evidence until November 30, 2022, when Chief Investigator Tim Garner authored the document that changed the first sexual harassment investigation (image above) from NOT-SUSTAINED to UNFOUNDED. **But for** the second sexual harassment allegation by Choi, the

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

CP had no ability to disprove the first sexual harassment allegations, and DDA Beth McCann's adverse employment actions on the CP were not warranted or justified. **The evidence to disprove Choi's allegations, and simultaneously prove the Adverse Employment Action was not ripe until November 30, 2022.** The CP believes the DDA is also liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period. Therefore, the CP believes the statute of limitations began to run when the adverse employment action acquired some degree of permanence or finality, in this case, November 30, 2022.

15. Therefore, the DDA action on November 30, 2022 (provided to the Commission), provides admission of fault and finality during the first investigation and connects the first and second investigations while simultaneously establishing a start date for the EEOC 300-day filing deadline. 300 days from November 30, 2022, is September 26, 2023; therefore, the CP's Charge (filed on May 18, 2023) was well within the filing deadline.

16. Although the outcome of the first sexual harassment investigation was changed on November 30, 2022, the adverse employment action by DDA Beth McCann on/about September 7, 2021, included conduct that was <u>reasonably likely</u> to impair a reasonable employee's job performance or prospects for advancement or promotion.

17. Beth McCann's conduct and failures since September 2021 imposed professional harm on the CP because she failed or refused to fully investigate the first sexual harassment allegation, which would have conclusively proven the CP's innocence through available exculpatory evidence. This type of available digital evidence is routinely investigated and used as part of investigations handled by the DDA. Additionally, the DDA office has trained employees and available equipment to promptly extract this type of digital evidence.

18. The CP provided the Commission with numerous written statements about the adverse employment action, imposed by DDA Beth McCann, which deleteriously impacted the CP's professional and personal life and created a hostile work environment for the CP at the DDA. Aside from written statements provided to the Commission, the CP is prepared to provide numerous other current and former employees who also have provided verbal statements about the adverse employment action and hostile work environment and have expressed their willingness to provide testimony. Some of these witnesses are within DDA Beth McCann's immediate staff.

19. As a result of Beth McCann's instruction to stay away from Choi and the subsequent public shaming within the office, the CP declined to attend numerous professional conferences from 2021 - 2023. Leading up to these professional conferences, the CP explained his reasoning to other employees when they asked him if he planned to attend these professional training sessions.

20. From September 2021 through November 2022, the CP received several documented unsolicited job opportunities. These opportunities were previously provided to the Commission and well documented in the CP's original Charge from May 18, 2023. During this time, the final outcome of the investigation "NOT-SUSTAINED" irrevocably damaged the CP's marketability, based on the type of the allegation (recent sexual harassment), the incompetent and incomplete September 2021 investigation, and the failure to pursue exculpatory evidence. During any potential employment application process within the law enforcement/criminal justice community, the CP would have been required to disclose the investigation and outcome (NOT SUSTAINED), and had no way to disprove the allegations at that time.

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

21. DDA Beth McCann's continued preferential treatment of Choi is documented in numerous written statements provided to the Commission.  According to former Denver Deputy District Attorney (now Arapahoe County Deputy District Attorney) Kate Tierney's written statement, "*Ms. Choi, on the other hand, had not suffered any professional consequences, and the office had not taken any action to combat issues with her in the future. Although I was no longer friends with her due to her unfounded accusations against me, I could see through social media and through people I was still friends with at the Denver DA's Office that she thrived. She was promoted to the Family Violence Unit, a unit within the office that relies heavily on integrity and ethical standards for incredibly serious cases involving domestic violence and child abuse. She maintained all of her connections within the office and attended our annual prosecutor's conference in 2021 and 2022. Given that other attorneys were also interested in the Family Violence Unit who were more experienced and passionate about the work than Ms. Choi, and yet she received the spot when it opened, it is hard to see it as anything other than a promotion because of these allegations; again, giving Ms. Choi something because she was perceived as the victim in the situation.*"

22. Beth McCann's conduct and failures continued to impose professional and personal harm on the CP because she **failed to protect the CP** from further false allegations from the same accuser.  If DDA Beth McCann had fully investigated the first sexual harassment allegation in September 2021 and investigated available exculpatory evidence as promised to the CP by Chief of Staff Liza Willis (in the audio-recorded meeting on September 7, 2021), it would have conclusively proven the CP's innocence through exculpatory evidence, Choi would have been terminated and there wouldn't be a second sexual harassment allegation.  **Again, if the first sexual harassment investigation had been fully investigated, Choi would have been fired in September 2021 and the CP would not have been subjected to <u>any</u> of the following events.**

23. In October 2022, at the initiation of the second sexual harassment investigation, DDA Beth McCann continued in a course or pattern of conduct that continued to protect Choi and unnecessarily subjected the CP to a hostile work environment which continued past the conclusion of the second sexual harassment investigation.

24. On October 14, 2022, Choi initiated false sexual harassment allegations, for the second time, against the CP.  Choi was having dinner with numerous DDA employees.  Choi verbally and electronically reported to several DDA employees, including Chief Deputy District Attorneys Daniel Cohen and Melissa Fox, that she allegedly received sexual harassment text messages from the CP.  Both are considered "Public Servants" by definition.

25. Choi was provided blanket believability once again.  She and Chief Deputy District Attorney Daniel Cohen also exchanged text communication that contained assumptions that the CP was suspected of using illicit drugs and alcohol usage.  These texts were recovered and previously provided to the Commission.

26. DDA Beth McCann intentionally or negligently disregarded physical evidence that would have, at a minimum, prompted further questioning of Choi about the allegations against the CP.  Choi had initiated a text conversation with Chief Deputy District Attorney Daniel Cohen and alleged she received "*disgusting*" text messages from the CP.  Choi then sent a screenshot of the alleged text messages to Chief Deputy District Attorney Daniel Cohen.  The timestamp on the screenshot image Choi sent to Chief Deputy District Attorney Daniel Cohen clearly indicated she allegedly received the CP's "*disgusting*" text messages 44 minutes **<u>after</u>** she initiated the text conversation with Chief Deputy District Attorney Daniel Cohen.

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

27. Instead, DDA Beth McCann and her staff continued to assume Choi was a victim and the CP was guilty. Over the weekend, Chief Deputy District Attorneys Daniel Cohen and Melissa Fox assumed Choi was a victim and periodically checked on Choi's well-being.

28. Chief Criminal Investigator Tim Garner interviewed and collected written statements from witnesses. These statements provided documented evidence employees were fully aware of the first sexual harassment allegations against the CP in September 2021 and substantiated the caustic environment the CP was forced to work.

29. DDA Beth McCann again violated the CP's rights, as protected under *Garrity v. New Jersey*. The CP was never advised of his rights under *Garrity v. New Jersey*; therefore, the CP believed the investigation was not administrative and was criminal in nature. The CP was confronted in his office by the senior ranking command staff of the DDA. The CP feared his job was in jeopardy once again.

30. On October 18, 2022, the CP proved his innocence when he voluntarily provided his cell phone records (with personal overwatch by Chief Criminal Investigator Tim Garner). These records conclusively proved the CP's phone never contacted Choi's phone and Choi's allegations against the CP were completely false. Simultaneously, it also provided evidence the CP was victimized by Choi and by the DDA, Beth McCann.

31. On October 19, 2022, the CP was again asked to prove his innocence when he was requested to consent to a forensic analysis of his phone. The CP consented and, once again, the evidence proved the CP's phone never contacted Choi's phone and Choi's allegations against the CP were completely false. Simultaneously, it also provided evidence the CP was victimized. The report indicated a contact for Choi's phone number, 719-393-5269, was created in the CP's phone contacts on February 21, 2020, **over a year and a half before the first allegation**. The forensic report also indicated Choi's contact was "BLOCKED" in the CP's phone contacts on June 18, 2022, almost **four months before the second allegation**.

32. In an October 19, 2022, **audio-recorded meeting** (9:18 minutes) with Chief Criminal Investigator Tim Garner, the CP expressed his desire to pursue criminal charges against the person(s) who fabricated the false allegations against the CP. The CP explained the personal and professional impact it has had on his life since the first sexual harassment investigation (September 2021). Chief Criminal Investigator Garner stated, "*And rightfully so. You're guarded.*" The CP stated, "*I am 100% guarded.*" The CP also stated, "*And that's why I've been secluded. I'm like a hermit.*" The CP explained he was told by coworkers their observations of the negative physical and emotional impact it had on the CP since the first sexual harassment investigation.

33. On October 19, 2022, and again on October 20, 2022, Choi refused to meet with Beth McCann and her staff.

34. On October 21, 2022, Choi met with Chief Criminal Investigator Tim Garner and Chief of Staff Liza Willis. Choi possessed her iPhone during this meeting. Choi advised she deleted the alleged text messages from her iPhone but had a backup of the messages on her Apple MacBook Air, which was at her residence. Choi advised she would bring in both devices on Monday, October 24, 2022. Although Beth McCann and her staff already possessed conclusive evidence that proved the CP's innocence, they continued to provide Choi with favorable treatment and failed to take steps to physically secure evidence (Choi's iPhone) which further victimized the CP.

35. On October 21, 2022, Choi voluntarily provided the DDA with alleged *Verizon* phone records, via an email to Chief Criminal Investigator Tim Garner. These records were examined by Chief

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

Criminal Investigator Tim Garner who determined Choi fabricated physical evidence, which included the CP's phone number. This evidence proved Choi was intentionally targeting the CP. Although Beth McCann and her staff possessed conclusive evidence that proved the CP's innocence, they continued to provide Choi with favorable treatment and intentionally ignored this fabricated physical evidence and took no steps to secure physical evidence (Choi's iPhone) which further victimized the CP.

36. On October 21, 2022, Choi advised the DDA, via a conversation with her supervisor, Chief Danielle Robinson, that she intended to "*reset her phone over the weekend*". Although Beth McCann and her staff were aware of Choi's plan to intentionally destroy physical evidence (resetting her phone), they continued to provide Choi with favorable treatment and intentionally ignored this and took no steps to secure physical evidence (Choi's phone) which further victimized the CP.

37. On October 22, 2022, Choi intentionally damaged her phone and MacBook Air. Acquired Apple work order receipts (3 hours and 25 minutes apart from one another, sequentially 22 work orders apart, and handled by two different Apple employees) indicated Choi subjected her devices to water. The work orders documented "*Customer does not wish to pursue data rescue for messages*". Choi advised she left both devices at the Apple store. Although Beth McCann and her staff were aware Choi carried out her intent to destroy physical evidence, and the location of her devices, they continued to provide Choi with favorable treatment and intentionally ignored this and took no steps to secure physical evidence (Choi's phone) which further victimized the CP.

38. On October 22, 2022, Choi sent an email to the DDA regarding her damaged iPhone and MacBook Air. Although Beth McCann and her staff were aware Choi intentionally damaged her iPhone and MacBook Air, they continued to provide Choi with favorable treatment and intentionally ignored this and took no steps to secure physical evidence (Choi's phone and MacBook Air) which further victimized the CP.

39. On October 24, 2022, Assistant District Attorney Zach McCabe and Chief Criminal Investigator Tim Garner met with Choi. Choi continued her subterfuge and alleged she was unable to log into her *Verizon* account, in their presence, because it was a family plan. Instead of pressing Choi, they continued to provide Choi with favorable treatment and allowed her to fabricate more physical evidence again the following day.

40. On October 25, 2022, Beth McCann and her staff were provided with another set of alleged phone records by Choi. These records were examined by Chief Criminal Investigator Tim Garner who determined Choi, once again, fabricated physical evidence which included the CP's phone number. This was the second set of alleged phone logs that were fabricated by Choi and targeted the CP. Although Beth McCann and her staff already possessed conclusive evidence which proved the CP's innocence, along with a previously fabricated phone log from Choi, they continued to provide Choi with favorable treatment and the DDA intentionally ignored this second fabrication of evidence and took no steps to secure physical evidence (Choi's phone and MacBook Air at the Apple store) which further victimized the CP.

41. On October 25, 2022, the DDA filed search warrants for *Verizon* phone records. Chief Investigator Garner authored the legal document(s). The sworn affidavit documented "*Your affiant [Garner] thoroughly investigated a prior sexual harassment complaint made by DDA Choi against investigator Dan Hines in August 2021. The outcome of this investigation **resulted in a written reprimand to investigator Hines.**"* Not only does this, once again, connect the first and second sexual harassment allegations/investigation, but this statement is a completely false, inflammatory, and prejudicial statement against the CP. To date, the DDA has made no effort

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

to correct this document within the courts. This document was filed with Denver County Courts, and is still open to public examination; therefore, it continuously victimizes and harms the CP.

42. In a November 1, 2022, **audio-recorded phone call** (12:09 minutes), Chief Criminal Investigator Tim Garner contacted the CP to advise the DDA office received the *Verizon* phone records. These records provided conclusive evidence which, once again, proved the CP's innocence. They also conclusively proved Choi targeted the CP and fabricated a contact with the CP's name, used her own phone number, and then repeatedly sent text messages to herself purporting them from the CP. Ironically, this was the exact theory the CP told Chief of Staff Liza Willis and Chief Criminal Investigator Tim Garner in the September 7, 2021 meeting that they advised the CP, "*And I'd like to that see that, and I think you sent it to me. The text. Let's look further into that, can we?*" This also confirmed the alleged Verizon phone logs, which were submitted by Choi on October 21st and October 25th, were fabricated physical evidence. Instead of **immediate** termination and subsequent criminal arrest, they continued to provide favorable treatment to Choi.

43. On November 2, 2022, Choi was terminated from the DDA. The CP respectfully requests the Commission to compare the wording in her termination letter which stated, in part, "*The evidence obtained in our investigation clearly shows that you fraudulently created text messages that appeared to be sent to you by DH, in an effort to cause him to be dismissed from employment for sexual harassment.*"

to the criminal elements of **Colorado Revised Statutes (C.R.S.) 18-8-306, Attempt to Influence a Public Servant**, "*Any person who attempts to influence any public servant by means of deceit or by threat of violence or economic reprisal against any person or property, with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action concerning any matter which is to be considered or performed by him or the agency or body of which he is a member, commits a class 4 felony*". Choi was not criminally charged. Beth McCann continued to provide favorable treatment towards Choi and intentionally refused to file criminal charges despite an overwhelming abundance of evidence and conduct that clearly fit the criminal elements. This further victimized the CP.

44. On November 2, 2022, Chief Criminal Investigator Tim Garner examined Choi's DDA employment laptop. He discovered physical evidence that proved Choi had used her DDA laptop to fabricate physical evidence (the alleged *Verizon* logs on October 21st and October 25th) against the CP. This proved Choi violated **Colorado Revised Statutes (C.R.S.) 18-8-111(a)(II), False Reporting to Authorities – False Information**, which states, "*A person commits false reporting to authorities if he/she unlawfully made a report or knowingly caused the transmission of a report to law enforcement authorities of a crime **OR** other incident within their official concern when the defendant knew that it had not occurred.*" Despite compelling evidence, Beth McCann continued to provide favorable treatment to Choi and intentionally refused to file criminal charges. This further victimized the CP.

45. On November 2, 2022, Beth McCann sent the following email to the employees of the DDA. "*As some of you know, Yujin Choi is no longer an employee of this office. Her departure arose as a result of serious allegations made by Ms. Choi against a member of the office. These allegations were investigated over the last two weeks and found not to be true. Ms. Choi's conduct was not in accordance with the values and standards of this office. While we have discussed this matter with others who were directly involved, please be sensitive to the reputations of those involved and refrain from discussing this matter. If you have any questions please see me, Maggie, or Zach (Liza is out of the office this week).*" Beth McCann's intentional choice of several words, including "her departure", leads the readers away from the otherwise ineluctable conclusion – Choi was TERMINATED. Choi was "terminated" because she engaged in felonious conduct. Beth McCann instructed the DDA

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

employees to protect the reputations of those involved (Choi, Beth McCann, and the DDA). In September 2021, after the first investigation, Beth McCann wasn't concerned about the CP's reputation and never issued a similar statement "*to be sensitive to the reputations of those involved*". This email, which was offensive and misleading to several DDA employees, was documented in their individual written statements. It further proves Beth McCann continued to provide Choi with favorable treatment. This further victimized the CP.

46. On November 2, 2022, after Choi's termination, Senior Criminal Investigator Teresa Aguilar told the CP she had a conversation with at least one attorney in the DDA office. According to Aguilar, the attorney(s) stated there were still attorneys in the DDA office who expressed distrust in the CP. This assumption of distrust was later documented in a January 10, 2023, written statement by Senior Criminal Investigator Shawna Treasure, who worked with Choi in the Family Violence Unit. Beth McCann's failures from the first sexual harassment investigation (September 2021) and subsequent adverse employment action failed to protect the CP and created a hostile work environment that continued even after Choi's termination. If Beth McCann had investigated the first sexual harassment investigation, exculpatory evidence would have been examined and proved Choi's allegations were fabricated. She would have been terminated in September 2021 and the CP would not have been subjected to everything that has occurred since. This further victimized the CP.

47. In two November 2, 2022, **audio-recorded phone calls** (9:48 and 9:26 minutes), Assistant District Attorney Maggie Conboy called the CP's cell phone. Assistant District Attorney Conboy explained she had numerous in-person conversations with DDA employees, mainly Choi's former unit (Family Violence Unit), to explain the second investigation. Although the first sexual harassment investigation was widely known within the office, Conboy's conversations failed to address and/or clear the assumption the CP was guilty. The CP told Assistant District Attorney Conboy about assumptions within the office, as provided by Senior Criminal Investigator Aguilar's statement.

48. In a November 8, 2022, **audio-recorded meeting** (37:52 minutes), Beth McCann made comments to the CP that minimized her failures to this point and attempted to justify the acceptance of allegations and McCann's labeling of Choi as a victim without any physical evidence or merit during the first allegation/investigation. Beth McCann stated the following personal reasoning, "*....lawyers, in particular, we're sworn to be you know honest and truthful and all of that...*" The CP immediately argued, "*And so are police officers*"; however, Beth McCann assumed the CP was guilty. Beth McCann advised the CP that he "*wouldn't understand*" and stated, "*When you're in management, this whole sexual harassment thing is so sensitive.*" The CP remind Beth McCann that he had retired from the Pennsylvania State Police at the rank of Captain (Troop Commander) and was the commanding officer of approximately 280 personnel, who were assigned to six State Police Stations, which spanned four counties. The CP explained the involuntary transfer was punishment and thus continued to harm the CP, physically, emotionally, and professionally.

49. In a November 15, 2022, **audio-recorded meeting** (19:15 minutes), Beth McCann advised the CP she was not going to pursue criminal charges because she believed Choi's conduct was not criminal. She advised the matter would be referred to the Colorado Supreme Court, Attorney Regulation Counsel (ARC). The CP argued anything the ARC would impose would be administrative and not criminal. The CP argued, that if criminal charges were filed against Choi, the ARC could consider those criminal charges for imposing punishment. Beth McCann agreed.

50. On November 16, 2022, the CP sent an email to Beth McCann and her immediate staff. The CP advised he was hurt by the decision to not criminally prosecute Choi and again reiterated

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

his belief that Chois' actions were criminal.   In subsequent CORA requests, **the CP acquired numerous emails from Beth McCann's immediate staff**.  These emails very clearly indicate their belief that Choi's actions were criminal.   Despite overwhelming physical evidence and staff members who clearly disagreed with her decision, Beth McCann continued to protect Choi with favorable decisions and did not pursue criminal charges.  This further victimized the CP.

51. On or about November 16, 2022, Chief Criminal Investigator Tim Garner had a private conversation with the CP.  Garner asked the CP how he was doing.  The CP expressed frustrations with the perceived continued preferential treatment towards Choi.  Garner agreed and opined Choi was being treated differently because she was a female and an attorney.  The CP confided in Garner about the impact of the first investigation (NOT SUSTAINED) had on him.  The CP explained, that between September 2021 and November 2022, when he was unable to prove his innocence through available exculpatory evidence, emotionally he was "*in some pretty dark places*".

52. On November 16, 2022, Beth McCann emailed the CP.  She stated, "*Thank you for the email Dan.  I had asked Bob Russel to look at this previously.  I will ask him to take another look.*"  Chief Deputy District Attorney Bob Russel is assigned to the Denver District Attorney's Office Appellate Division and provided Beth McCann with legal advice on this matter.  It was later learned Beth McCann intentionally withheld critical facts which caused Chief Deputy District Attorney Bob Russel to make an uninformed decision (refer to the November 17, 2022, **audio-recorded meeting** with Chief of Staff Liza Willis).

53. Chief Criminal Investigator Garner later advised the CP that he ensured he was present for the second meeting (on November 16, 2022) to ensure all of the facts were provided to Chief Deputy District Attorney Bob Russel.

54. In a November 16, 2022, **audio-recorded phone call** from Beth McCann.  (Hines received the phone call from an unknown number on his desk phone).   Hines activated his digital recorder.  McCann explained the office was going to change its decision and send the investigation(s) for an outside review.   Hines explained he believed that was prudent to have an outside agency provide a prosecutorial decision.  McCann stated, "*We were always going to refer if we thought there was a potential criminal case.  We weren't going to make that ultimate decision, uh, in the office.  But we were not going to refer it out because we weren't seeing that um we had the evidence for a criminal case.  But going through a little more carefully, uh, we decided that it was, I decided that we would, um, it was better to have it looked at independently and have someone else make the choi decision about that.*"

55. In a  November 17, 2022, **audio-recorded meeting** with Chief of Staff Liza Willis, Willis asked for a few minutes to talk with the CP.  Willis then said the CP was "*owed an apology*".  Willis stated, "*After the first one I knew there was something hinky*".  Willis advised they always knew "*something was weird with Yujin*".  Willis reiterated her apologies.  Willis stated they knew better because they knew the CP's reputation and his background.  Willis stated she has been in contact with Carla Pierce, from the City Attorney's Office.  Hines explained he was upset because Beth McCann originally stated the office wasn't going to pursue criminal charges.  Willis said, "*Rightfully so*" and advised she heard about that when she returned from vacation.  Willis stated, "*I was in shock.*"  Willis stated, "*because Bob (Russel) counseled her [Beth McCann] and but she didn't give Bob all of the facts.  And so now you know it's reversed*".  Willis stated she felt so bad and they knew from the first time "*something was up*".  The CP explained the impact of the Adverse Employment Action with the involuntary transfer, "*But I was moved*".  Willis admitted that could have been handled either way, with Choi moving or Hines moving.  Willis stated, "*Back then, I got to admit.  I don't know how much to say.  Although Tim and I direct the investigation there's some decisions that we cannot make and we don't follow.  And Beth and people were still on the*

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

*fence back then and that's what lead to that. You're right. You're right, you were moved, and it does look like a punishment. Feels like a punishment.*" Hines explained it has been hard for the past year and a half because he wasn't given the opportunity to prove his innocence. Hines explained he started looking at leaving the office because he didn't want to work here anymore and still had some of those feelings. Hines stated he felt like he was a leper. Hines explained how it has impacted him and how it impacted his social interaction with the office personnel and functions. Willis apologized again that she (the office) that she (Yujin) was "*believable*". Willis stated, "*There were some other signals I received from Yujin back before that all came up.*" Hines asked Willis if she remembered when she saw him in the hall on August 25th, 2021, when she asked him not to keep his head down. Willis remembered that interaction and reiterated her apology. Hines explained it's been difficult. Willis stated, "*I can't even imagine what you've gone through - the worry. I can't even imagine what you've gone through Dan.*" Willis recalled the first sexual harassment investigation, "*Tim and I have always felt this way I remember again the first one and us taking the results back to, to Beth and Zach and, and ah Maggie and said he didn't do this he didn't' do this.*" Willis then provided a quote from Beth McCann, "**But she's a victim**. *And why would she do this? And why would she say?* Willis stated she told Beth McCann, "*He didn't do this. He didn't. And I'm not going I don't feel comfortable. You want me to do this, but I'm not going to. And. Tim and I you know convinced her. We did meet with the City Attorney, and she said, Ah, this doesn't sound like he did it. I said, he didn't Carla. Not from what we got. And he's adamant. And this is not somebody who did something like that or said those things that she is alleging.*" Willis stated, "*I felt it from the first time and that's why Tim and I were adamant we're not doing anything. We can't. Um, there's nothing here. Well, she's.... We're not and so. **I wish we had done more at that time.** Again, my apologies. I would understand if you didn't feel comfortable here. I hope you stay with us.*" Willis acknowledged the gossip in the office and how it has impacted how people look at the CP. Willis advised that the office (Beth McCann) had reversed her position regarding criminal charges. Willis further explained that Bob (Russel) advised McCann along the way. Willis stated, "*Bob was giving her advice. But he didn't have all of the facts.*" Willis stated before she left for vacation that was the track they were on (to pursue criminal charges). Willis stated she had a conversation with McCann. According to Willis, McCann said, "*By the way, I'm not.*" Willis stated, "*I was stunned. But I figured I was the last to know.*" This recorded meeting repeatedly provides:

a. Statements that Beth McCann was aware of previous issues/warning signs with Choi.
b. Evidence of Beth McCann's preconceived verbal statement(s) that Choi was a victim and the immediate presumption the CP was guilty.
c. Confirmation of Beth McCann's continued favorable treatment of Choi.
d. Admissions of failures during the first investigation.
e. Admissions of Adverse Employment Action subjected solely to the CP and the appearance that this action was "punishment".
f. Acknowledgement of the damaging impact the failed investigation in 2021 and subsequent Adverse Employment Action had on the CP.
g. Statements that Beth McCann intentionally failed to provide critical facts to Chief Deputy District Attorney Bob Russel before determining to criminal prosecute Choi.
h. Statements that Beth McCann reversed this decision after the critical facts were forced to be provided by Beth McCann's immediate staff.
i. Articulation that Beth McCann's own staff believed Choi's conduct was criminal.

56. Chief Criminal Investigator Tim Garner told the CP that the matter was being referred to the Arapahoe County District Attorney's Office for a prosecutorial decision.

57. On November 30, 2022, (419 days after the meeting for the first sexual harassment investigation) Chief Criminal Investigator Tim Garner changed the outcome of the first sexual harassment investigation from NOT SUSTAINED to UNFOUNDED, meaning, "*having no foundation or basis in fact*". This change occurred after the DDA finally acquired exculpatory

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

physical evidence that was available to them in September 2021. This was exculpatory evidence Chief of Staff Liza Willis and Chief Criminal Investigator Tim Garner assured the CP they planned to further investigate on September 7, 2021. Prior to this date, the CP had no means of proving his innocence; therefore, **the evidence was not ripe**. The CP asserts that this act, which concedes failures and faults, clearly establishes a continuation from the first to the second investigation and simultaneously establishes the 300-day deadline from November 30, 2022. The CP believes the statute of limitations began to run when the adverse employment action acquired some degree of permanence or finality, in this case, November 30, 2022.

58. On/around December 2, 2022, Denver Assistant District Attorney Zach McCabe sent the following email to Larimer County District Attorney Gordon McLaughlin. It indicates Beth McCann either directly or indirectly spoke with the Larimer County District Attorney prior to McCabe's email. The communication Beth McCann had with the Larimer County District Attorney's Office was not recovered or provided to the CP under a CORA request. Based upon Beth McCann's previous actions/failures, statements about Beth McCann's continued favorable treatment towards Choi, statements about Beth McCann's presumption "*But she's a victim*" and assumption the CP was guilty, Beth McCann's documented statements of resistance to pursue criminal charges despite overwhelming physical evidence, statements that documented Beth McCann withheld critical facts which swayed the advisement by Chief Deputy District Attorney Bob Russel, her preemptive communication to the Larimer County District Attorney is viewed as yet another act by Beth McCann to favorably treat Choi. Clearly, the perception is Beth McCann was more concerned with protecting Choi, Beth McCann, and the Denver District Attorney's Office, instead of pursuing justice and acknowledging the CP was truly the victim. Based upon the previous, Beth McCann should have removed herself from the process altogether. The prosecutorial review was assigned to Larimer County Assistant District Attorney Matt Maillaro.

> On Fri, Dec 2, 2022 at 10:11 AM Zach McCabe <Zem@denverda.org> wrote:
> Gordon,
>
> I hope you are doing well. I understand that Beth and / or Tom Raynes discussed review of a filing decision as a special prosecutor for a potential filing involving an one of our employees. Please let me know who in your office I can send the collected material to.
>
> Thanks,
>
> Zach



**Zach McCabe | Assistant District Attorney**

Denver District Attorney's Office
201 W. Colfax Avenue, Dept. 801 | Denver, CO 80202
Office: 720-913-9255 | Mobile: 303-564-2416
ZEM@DenverDA.org | www.DenverDA.org

59. On January 6, 2023, Larimer County Assistant District Attorney (ADA) Matt Maillaro sent the following email to Denver County District Attorney Chief Criminal Investigator Tim Garner. Maillaro **confirmed Choi's actions fit the criminal elements** of 18-8-306 (Attempt to

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

Influence a Public Servant) and 18-8-111 (False Reporting to Authorities). ADA Maillaro also expressed his concern if this is a case that should ever see a jury. ADA Maillaro's statement contradicts Beth McCann's previous statements that she didn't feel Choi's actions were criminal conduct.

> **From:** Matt Maillaro <maillamj@co.larimer.co.us>
> **Sent:** Friday, January 6, 2023 12:08 PM
> **To:** Tim Garner <Tdg@denverda.org>
> **Subject:** Re: Special Prosecution
>
>
> Tim -
>
>
> can we do a short virtual meet or telephone call this afternoon or when you are available next week? I just want to briefly discuss 18-8-306 and 18-8-111 with you and get your feeling. I am not worried about the conduct fitting the elements (because it technically does) but more whether this is a case that should ever see a jury.
>
>
> I don't think we need to discuss the investigation much if at all at this point.
>
>
> thanks

60. On January 6, 2023, Chief Criminal Investigator Tim Garner forwarded the aforemtnioned email from Larimer Assistant District Attorney Maillaro and sent the following email to Denver Assistant District Attorney Zach McCabe. Garner advised McCabe of Maillaro's decision and concern about all witnesses and Subpoena duces tecum (*a subpoena for the production of evidence, is a court summons ordering the recipient to appear before the court and produce documents or other tangible evidence for use at a hearing or trial*). Clearly, ADA Maillaro's legal decision to prosecute or not prosecute Choi was not based on whether Choi violated the law but provided concern about the potential embarrassment it would potentially cause any witnesses called by the defense, such as employees of the Denver District Attorney's Office and the simultaneous subpoena of the content of their phones. This further victimized the CP.

---

> **From:** Tim Garner
> **Sent:** Friday, January 6, 2023 1:47 PM
> **To:** Zach McCabe <Zem@denverda.org>
> **Subject:** FW: Special Prosecution

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

> Talked with Matt. He is going to talk with his DA before final decision. Concerned about all witness/SDT's etc that would be filed by defense.

> Was wondering what was happening with ARC. Told him I had no idea. Have you heard anything from them?



**Tim Garner | Chief Investigator**
Denver District Attorney's Office
201 W. Colfax Avenue, Dept. 801 | Denver, CO 80202
tdg@denverda.org | 720-913-9138 (O) 720-473-1594 (cell)
www.denverda.org

61. On January 13, 2023, Chief Criminal Investigator Garner provided the CP with ADA Maillaro's decision letter, dated January 13, 2023. Chief Garner expressed his complete disagreement with ADA Maillaro's decision. The decision letter is imbued with numerous instances of intentional or negligent omissions of critical facts. ADA Maillaro even defended Choi's actions as she became "*less interested*" in the investigation as it progressed. In what world does the criminal justice system make a prosecutorial decision based upon the suspect becoming "less interested" in an investigation that could potentially prosecute them? Each issue is addressed in a previous document labeled, "*Allegation of collusion between the Denver District Attorney and the Larimer County Assistant District Attorney*" which was previously filed with the Commission. In paragraph 2 of ADA Maillaro's *Legal Conclusion – decision to not file criminal charges*, ADA Maillaro completely contradicts his January 6, 2023 email to Chief Criminal Investigator Tim Garner when he stated Choi's conduct did rise to criminal conduct, "*I just want to briefly discuss 18-8-306 and 18-8-111 with you and get your feeling. I am not worried about the conduct fitting the elements (because it technically does) but more whether this is a case that should ever see a jury.*"

> The conduct here is morally, professionally, and ethically concerning, but for all the reasons stated above, I do not believe the conduct rises to the threshold of criminal charges.

The last paragraph in ADA Maillaro's decision letter also contradicts his January 6th email to Chief Criminal Investigator Tim Garner.

The published decision by ADA Maillaro was uniquely shared by Beth McCann alone. If Choi had been criminally charged, it would adversely impact the decision by the Attorney Regulation Counsel (ARC) regarding Choi's conduct. It would have embarrassed Beth McCann since she had previously opined that Choi's conduct was not criminal. It would have embarrassed the Denver District Attorney's Office. It would have created a prosecutorial ethical dilemma and potentially created a monumental amount of criminal conviction appeals, with all of the criminal cases Choi has handled (over 350) since the beginning of her employment in 2019. It would also have adversely impacted any unemployment claim filed by Choi.

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

62. On/about November 8, 2022, Choi filed for unemployment compensation through the Colorado Department of Labor. On February 8, 2023, the Colorado Department of Labor approved Choi's unemployment claim. This jaded decision by ADA Maillaro continued to provide Choi with favorable decisions and further victimized the CP. If Choi had been criminally charged, it should have disqualified her from any Colorado Unemployment compensation, which states,"

Title 8 - Labor and Industry, Article 73 - Benefits - Eligibility - Disqualification, § 8-73-108,
- *(3)(c), "The gross misconduct of an individual causing his discharge from employment shall result in a disqualification of twenty-six weeks. "Gross misconduct" means conduct evincing such willful or wanton disregard of an employer's interests **or negligence or harm of such a degree** or recurrence **as to manifest culpability or wrongful intent**, or assault or threatened assault upon supervisors, coworkers, or others at the work site".*
- *(5)(e)(VII), "Violation of a statute or of a company rule which resulted or could have resulted in serious damage to the employer's property or interests or could have endangered the life of the worker or other persons, such as: Mistreatment of patients in a hospital or nursing home; serving liquor to minors; selling prescription items without prescriptions from licensed doctors; **immoral conduct which has an effect on worker's job status**; divulging of confidential information which resulted or could have resulted in damage to the employer's interests; failure to observe conspicuously posted safety rules; **intentional falsification of expense accounts, inventories, or other records or reports whether or not substantial harm or injury was incurred**; or removal or attempted removal of employer's property from the premises of the employer without proper authority".*
- *(5)(e)(X) "Incarceration after conviction of a violation of any law, **or loss of license, certification, credential, condition, or other professional designation that is essential to job performance."***
- *(5)(e)(XIV) "Rudeness, insolence, **or offensive behavior** of the worker not reasonably to be countenanced by a customer, supervisor, or fellow worker;*

63. A review of public records identified known connections between DDA Beth McCann and Larimer County ADA Maillaro. These connections include political associations, political projects, and financial donations to political campaigns. All of these connections were fully documented in more detail and submitted to the Commission in the document "*Allegation of collusion between the Denver District Attorney and the Larimer County Assistant District Attorney*". Beth McCann should have ensured the review for a special prosecution went to a reviewer with whom she doesn't share identified connections, especially when there are countless documented statements that Beth McCann has continually made comments and decisions that favored Choi.

64. On or about March 29, 2023, Dr. Jim Abrams, the CP's attorney, sent an email to Beth McCann. The email advised of a Legal Hold. The DDA was provided with documentation similar to this document and requested the name of legal counsel for Beth McCann.

65. On April 12, 2023, the CP was subjected to retaliatory actions/statements in the form of passive/aggressive comments by Assistant District Attorney Maggie Conboy. The CP walked to the coffee machine/break area on the 8th floor. As he approached the break area, he noticed Assistant District Attorney Maggie Conboy speaking to someone else who was just out of his view. They finished their conversation and Conboy turned towards the CP just as he was about to approach the coffee machine. As Conboy turned towards the CP, he noticed Conboy's face immediately went from a relaxed expression to a very stern look. The CP sensed animosity. The CP motioned his arm/hand towards the coffee machine, for her to go first, and the CP walked a few feet away to the windows and to give Conboy space. A few seconds later, the CP heard, "*Dan?*" He turned around and replied, "*Yes ma'am*". As she held her coffee, Conboy stated, "*When I called you, it was as a friend.*" Confused, the CP said, "*Excuse me?*" She repeated, "*When I called you that night, it was as a friend.*" Without providing any time for the CP

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

to respond, Conboy immediately turned and walked away. As the CP was pouring his coffee, he heard a door loudly close in the direction of Conboy's office. The CP had come from that direction and knew no one was in the few offices between the coffee area and Conboy's office. A few moments later, the CP walked past her office, and her door was now closed. The CP realized Conboy's hostility towards him was because Conboy was now aware the CP recorded Conboy when she called the CP on November 2, 2022 (after business hours) and explained her **official actions** that day. This hostility toward the CP was immediately documented and sent in an email to Beth McCann and her staff. The CP took Personal Time Off (PTO) for the remainder of the day.

66. In a May 2023 conversation with Chief Criminal Investigator Tim Garner, Garner still believed criminal charges should have been filed against Choi. Chief Criminal Investigator Garner pointed out that the office doesn't submit search warrants (for phone records) for Internal Investigations, nor would a court approve a search warrant for an "internal" investigation.

67. On May 23, 2023, the CP was subjected to a retaliatory statement by Chief Deputy District Attorney Phil Reinert. Just outside the office building, the CP was having a private conversation with Deputy District Attorney Sam Shivley. During this conversation, Shivley expressed his apology and compassion to the CP for everything he has been through. Shivley also expressed his disbelief that Choi was not criminally charged. Chief Deputy District Attorney Reinert walked past the CP and Shively and asked what they were doing. Chief Deputy District Attorney Reinert then asked them, "*Are you guys checking out and whistling at the girls as they pass by?*" The CP responded, "*Chief, under recent events and allegations, I will refrain from even commenting on that.*" Reinert's statement was witnessed by Deputy District Attorney Sam Shivley. The CP immediately documented this incident and submitted it to the Commission.

68. On June 1, 2023, the CP sent Larimer County ADA Maillaro an email to inquire about his CORA request for "*any correspondence (electronic and non-electronic) that ADA Maillaro had with any employee of the Denver District Attorney's Office regarding this matter*". ADA Maillaro responded and **refused** to provide the CP with any correspondence. ADA Maillaro alleged all correspondence(s) were considered "*work product*" and protected under **C.R.S. § 24-72-202 (6)(a)(II) and (6.5)(a).**

69. As the **Assistant** District Attorney, ADA Maillaro is not an "elected official"; therefore, he is not protected under the umbrella of **C.R.S. § 24-72-202 (6)(a)(II) and (6.5)(a),** which states in part, "*for the benefit of ELECTED officials, which materials express an opinion or are deliberative in nature and are communicated for the purpose of assisting such ELECTED officials in reaching a decision within the scope of their authority.* However, this response by ADA Maillaro imposes objective concerns with perceived transparency.

70. On or about July 2, 2023, the CP located a very similar case from New York. (New Release) In that investigation, E.H., an Ossining New York Police Officer, was arrested for allegedly falsely claiming her coworkers were sending her threatening text messages. In that case, the District Attorney's Office, as in this case, conducted the investigation. Through the acquisition of official phone records, NY prosecutors allege the officer was actually sending the text messages to herself. The officer was criminally charged with four counts of third-degree falsely reporting an incident and another three counts of first-degree filing a false instrument. Although the case is from New York, it shares very similar elements and conduct by the accuser, including the defendant becoming "*less interested*" and wanting to "discontinue" the investigation as it progressed.

Daniel Hines
EEOC Number: 541-2023-02502
Response to the Respondent's Position Statement
August 29, 2023

The United States Supreme Court defines offensive conduct as "*sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.*" <u>Meritor Sav'gs Bank v. Vinson</u>, 477 U.S. 57, 67 (1986). The conduct does not need to be severe AND pervasive. The burden is severe **OR** pervasive. The second part of determining whether conduct meets the standard for a claim is whether the severe or pervasive conduct is **both** objectively and subjectively offensive. Conduct is **subjectively offensive** if it is offensive to the victim of the act. The CP provided countless examples, documentation, and audio recordings of the failures of Beth McCann and how they subjected him to a subjectively offensive environment. This impacted the CP physically, psychologically, emotionally, socially, and financially. Conduct is **objectively offensive** if it is offensive to a <u>**reasonable person**</u> in the community. The CP has not only provided numerous written statements but also provided numerous audio-recorded conversations and is prepared to provide additional witnesses who will all provide testimony about the objectively offensive environment the CP was forced to work in. Many of these witnesses are senior-ranking employees in the DDA office and have told the CP of their willingness to testify. Hostile work environment claims happen when employers create <u>**or permit**</u> abusive work conditions. As the Commission is aware, a hostile work environment under Federal and Colorado employment law arises when offensive behavior alters the terms, conditions, or privileges of the employment. **There is no exact list of circumstances that create a hostile work environment.** A core question is how the behavior affected the employee. A hostile work environment claim does not require a tangible employment act or a discrete economic harm to the employee. It is enough that the employee experienced psychological harm as a result of the toxic environment. An employee need not even quit a job to avoid a hostile work environment. The ultimate standard is whether the behavior explicitly or constructively altered the terms and conditions of employment. <u>Burlington Indus., Inc. v Ellerth</u>, 524 U.S. 742, 752 (1998). An employer may implement an adverse, tangible employment action as part of the harassment or **simply** <u>**allow the employee to suffer a hostile work environment**</u>.

The CP asks the Commission to conclude the actions/inactions by the Denver District Attorney were egregious and prove the Denver District Attorney took an action/inaction or **engaged in a course or pattern of conduct** that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of the Charging Party's employment. The adverse employment action **included conduct that was** <u>**reasonably likely**</u> **to impair a reasonable employee's job performance or prospects for advancement or promotion**. These facts are identified in the CP's timeline, the CP's original Charge, the supplemental charge against the Larimer County District Attorney, acquired documents, emails, written and verbal statements, and numerous audio recordings of conversations the CP had with DDA Beth McCann and her command staff. These facts conclusively prove the Denver District Attorney's Office and the Larimer County District Attorney's Office violated Title VII and that the threshold of prima facia has been more than sufficiently met. Additionally, the CP asks the Commission to conclude that both the adverse employment actions began with the first sexual harassment investigation and continued to/through the second sexual harassment. The outcome of the first investigation was also retroactively changed on November 30, 2022. The allegations/investigations and the course of conduct were continuing. As such, these also exceed the threshold of prima facia for violations under Title VII.